Judy M. STIVER and Ray E. Stiver, Cross Plaintiffs–Appellants,

v.

Philip J. PARKER, M.D.; John R. Hayes; W.J. Ringold, M.D.; L.C. Jorge, M.D.; C.M. Decespedes, M.D.; and Noel P. Keane, Third–Party Defendants–Appellees,

Alexander Malahoff, Counter Defendant–Appellee.

No. 90–1624.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 14, 1991.

Decided Sept. 15, 1992.

Rehearing and Rehearing En Banc Denied Dec. 21, 1992.

Mark Chessman, Warren, Mich., for plaintiff-appellee.

John B. DeMoss, Mt. Clemons, Mich., for intervenor-appellee.

Wiley E. Bean (argued & briefed), Patricia D. Bean, Bean & Bean, Grand Ledge, Mich., for defendants-appellants Ray E. Stiver and Judy M. Stiver.

Thomas G. Parachini (briefed), Marjorie L. Kolin, Miller, Canfield, Paddock & Stone, Detroit, Mich., for defendant-appellee Noel P. Keane.

Edward C. Reynolds, Jr. (briefed), Priscilla L. Schwarze, (briefed), Schureman, Frakes, Glass & Wulfmeier, Detroit, Mich., for defendant-appellee Philip J. Parker, M.D.

Anthony G. Arnone (argued), Mark W. Peyser, Susan Healy Zitterman (briefed), Kitch, Saurbier, Drutchas, Wagner & Kenney, Detroit, Mich., for defendant-appellee John R. Hayes.

Jon P. Desenberg, David J. Franks (argued & briefed), Moll, Desenberg & Bayer, Detroit, Mich., for defendants-appellees W.J. Ringold, L.C. Jorge and C.M. Decespedes.

Before: MERRITT, Chief Judge, KENNEDY and JONES, Circuit Judges.

MERRITT, Chief Judge.

The Michigan legislature by statute has now criminalized "surrogate" parent contracts under which a woman agrees to give birth and then to transfer her child to another for a fee.[1] Prior to the enactment of the statute, the defendant, Noel Keane, as a broker, engaged Judy Stiver under such a

contract to have a baby for Alexander Malahoff. Judy Stiver was artificially inseminated with Malahoff's semen, and a baby, Christopher, was born. By mistake, however, Stiver's husband was the father, not Malahoff. Christopher Stiver had an active cytomegalovirus (CMV) infection when he was born, secreting CMV in his urine.[2] He was diagnosed as suffering from cytomegalic inclusion disease (CID) at birth.[3] He was born microcephalic and suffers from hearing loss, mental retardation, and severe neuro-muscular disorders. No one disputes that Christopher's cytomegalic inclusion disease resulted from Judy Stiver's exposure to and contraction of cytomegalovirus, probably near the time of conception or early during her pregnancy.[4] Cytome-

1. The statute, known as the "Surrogate Parenting Act," declares that "[a] person shall not enter into, induce, arrange, procure, or otherwise assist in the formation of a surrogate parentage contract for compensation." Mich. Comp.Laws Ann. 722.859(1). The statute makes participation in a surrogacy contract for compensation a misdemeanor, punishable by a fine not greater than $10,000 or imprisonment for not more than a year or both. *See id.* at section (2). A person who arranges or procures such a contract "is guilty of a felony punishable by a fine of not more than $50,000 or imprisonment for not more than 5 years, or both." *Id.* at section (3). Such contracts are "void and unenforceable as contrary to public policy." Mich. Comp.Laws Ann. 722.855. The statute's main provisions became effective Sept. 1, 1988.

2. Cytomegalovirus was first isolated in 1956. Starr, *Cytomegalovirus,* 26 PEDIATRIC/CLINICS OF NORTH AMERICA 283 (1979). "Cytomegalovirus is a DNA virus belonging to the herpesvirus family." *Id.* Once contracted, CMV "probably remains latent in the body for life." *Id.* The incidence of CMV in the United States population is widespread: 10—30% of children have the infection by age 10; 60—90% of the population have been infected by age 60. Nevertheless, 20—50% of women of childbearing age are still susceptible to contracting the infection. *Id.* at 284. CMV has been found in saliva, urine, tears, respiratory excretions, cervical secretions and semen. *Id.* "Cytomegalovirus (CMV) is currently recognized as the leading cause of congenital viral infection involving 0.5% to 2.4% of all live births." *See Record,* Document 45, for Pass, *et al., Outcome of Symptomatic Congenital Cytomegalovirus Infection: Results of Long–Term Longitudinal Follow-up,* 66 PEDIATRICS 758–62 (1980). Christopher's secreting CMV in his urine when he was born indicates that he contracted the infection *in utero* rather

than when he was passing through the birth canal. *See* Record Document 45 for Waner, *et al., Cytomegalovirus* (Chapter 833) of MANUAL OF CLINICAL IMMUNOLOGY, 2D AT 626.

3. *See* Record Document 74. Of the 0.5% to 2.4% of children with CMV at birth, 5—10% have a serious illness known as cytomegalic inclusion disease (CID). Bale, *et al., Congenital Cytomegalovirus Infection: Information for Educational Personnel,* 140 AMERICAN JOURNAL OF DISEASES OF CHILDREN 128 (1986). "Cytomegalic inclusion disease, which is caused by CMV, represents the most common, serious congenital (occurring before birth) illness due to an infectious agent." *Id.* Infants with CID "can have damage to numerous body organs, including the lungs, liver, spleen, heart and brain" with the most serious consequence "damage done to the developing nervous system." *Id.* In one study of thirty-four patients born with congenital CMV and symptomatic at birth, ten died. Of the 23 surviving patients with follow-up exams, all but two had central nervous system or auditory handicaps. Microcephaly occurred in 16, mental retardation in 14, hearing loss in 7, and neuromuscular disorders in 8. *See* Record Document 45 for Pass, *supra* n. 3, at Abstract.

4. Because Christopher's problems are so severe, it is likely that Judy Stiver had a primary or first infection with CMV early during her pregnancy with Christopher. *See Record* Document 45, including article concerning relative severity of congenital infections following primary and recurring infections: *Stagno, et al., Congenital Cytomegalovirus Infection,* 306 THE NEW ENGLAND JOURNAL OF MEDICINE 945 (1982). Contraction at the time of or early in pregnancy is consistent with the severe damage to Christopher. *See* Deposition of Dr. Dyke, Record Document 164, *e.g.,* at 36 and 75–76.

galovirus can be sexually transmitted,[5] although it is also transmitted through other body fluids.[6]

The Stivers believe the source of Judy Stiver's exposure was Alexander Malahoff's semen, and have sued Keane and four doctors and a lawyer who participated in Keane's surrogacy program for negligence. The defendants defend generally on two grounds: (1) that they owed no duty of care to the Stivers and (2) that the Stivers cannot prove the program caused their harm.

This is a negligence, not a strict liability or breach of warranty action. The question in this diversity action under Michigan law is whether the Stivers' negligence action against Keane and the other participating program professionals should go to the jury, or whether the District Court was correct in dismissing the action on motion for summary judgment. The case raises issues of first impression concerning the legal rights and duties of all those involved in such surrogate arrangements. We conclude under the Michigan law of negligence that the defendants owed an affirmative duty to act to protect the plaintiffs against harm, a duty that may have been breached. The court below was incorrect in removing the case from the jury. We therefore reverse and remand for jury trial as to Keane and the other professionals.

In the original lawsuit in this case the Stivers brought a claim against Malahoff. They asserted that his failure to be tested for CMV resulted in their severe emotional and financial losses. They also brought a claim against him for intentional infliction of emotional distress. Although the Stivers' notice of appeal named Malahoff, their brief on appeal has no assignment of error against Malahoff, and we find their appeal as to Malahoff waived.

## I. Facts

In his surrogacy business Keane operated both as a lawyer for the contracting father and as the manager of a business. Keane drafted and used two standard form contracts in his surrogacy program: the first, a contract between himself and the prospective father and the second, a contract between the prospective father and surrogate mother. Under the contract with the prospective father Keane agreed to locate and negotiate an agreement with a prospective surrogate mother. Under this contract he also agreed to draft the second contract which governs the surrogacy agreement itself. In addition he agreed to represent the contracting father in matters related to the transfer of the child to the contracting father and in having the contracting father's name placed on the child's birth certificate. If insemination

---

**5.** See Record Document 182, attachment of medical testimony, asserting that CMV is sexually transmitted. As early as 1972 it had been recognized that semen could carry CMV and it was postulated that CMV may be "transmitted by venereal contact." Lang, et al., Demonstration of Cytomegalovirus in Semen, 287 NEW ENGLAND JOURNAL OF MEDICINE 756–58, 1972. The same researchers later concluded that the "prolonged asymptomatic presence of cytomegalovirus in semen may result in unrecognized venereal transmission of the virus." Lang, et al., Cytmegalovirus in Semen, 291 THE NEW ENGLAND JOURNAL OF MEDICINE 121–13 (1974). A year later the researchers reiterated their demonstration of "the presence and persistence of cytomegalovirus (CMV) in human semen" and their report that CMV "may be venereally transmitted." Lang, et al., Cytomegalovirus in Semen: Observations in Selected Populations, 132 THE JOURNAL OF INFECTIOUS DISEASES 472–73 (1975). See also Drew, et al., Prevalence of Cytomegalovirus Infection in Homosexual Men, 143 THE JOURNAL OF INFECTIOUS DISEASES 188–92 (1981) (noting the increasing evidence that cytomegalovirus (CMV) infections can be sexually transmitted and that "sexual transmission is an important mode of spread of CMV"). Continuing research confirmed the venereal/sexual transmission of the infection. See Biggar, Seminal Fluid Excretion of Cytomegalovirus Related to Immunosuppression in Homosexual Men, 286 BRITISH MEDICAL JOURNAL 2010 (1983) (noting that "venereal transmission of cytomegalovirus may occur between heterosexuals and might explain the high prevalence of antibodies to cytomegalovirus in homosexual men" and that when CMV is not present in urine and blood, it can be found in semen); McGown, et al., Prevalence of Cytomegalovirus and Herpes Simplex Virus in Human Semen, 6 INTERNATIONAL JOURNAL OF ANDROLOGY 331–36 (1983) (noting increasing evidence that CMV infections can be sexually transmitted and citing research from 1972, 1975, 1981, and 1982).

**6.** See Record Document 45 for Waner, supra n. 2 at 622.

was not successful, Keane was obliged to negotiate with additional prospective surrogate mothers. In addition to his role as the recruiter of prospective surrogate mothers, lawyer for the contracting father, and drafter of the surrogacy agreement, Keane organized the rest of the program. He sent the woman, and her husband if she was married, to a psychiatrist, Phillip J. Parker, who was to screen the woman as to likely success as a surrogate mother and to counsel her and her husband if she entered into a surrogacy agreement. He arranged with a group of doctors, W.J. Ringold, L.C. Jorge, and C.M. Decespedes, to take care of the medical aspects of the surrogacy program and made appointments with the prospective surrogate mother to see them. The program also provided a lawyer, John R. Hayes, for the woman. If the woman agreed to become a surrogate mother and insemination was successful, Keane supervised the woman's compliance with the contract and continued to oversee the details of the program. The contracting father was to pay Keane a nonrefundable fee of $5,000, as well as his share of the program expenses. Estimates of those expenses totalling approximately $3,500 were appended to the contract: paternity testing—$550; psychiatric testing of prospective surrogate mother—$250; medical exam for surrogate mother—$200; insemination—$1800; surrogate's attorney fees—$300; and pro rata share of program's advertising costs to locate surrogates—$300.

The second standard contract, the one between the surrogate mother and the contracting father, set out obligations for both parties. Although the prices charged may generally reflect the actual sales price of babies in the marketplace, it was a one-sided contract favoring the father in the sense that the surrogate mother was to assume all of the risks of injury or loss. It required the woman to be artificially inseminated and to carry the baby to term unless, after *in utero* testing, the father wished the mother to terminate the pregnancy in the event of genetic or congenital malformation of the child. The woman was to refrain from becoming attached emotionally to the child and then surrender the child to the father at birth. She "assumed all risks" of pregnancy and childbirth and postpartum complications, including death. A boilerplate addendum to the contract listed as possible risks several hundred infections and diseases, including leukemia, Hodgkins' disease, pneumonia, tuberculosis, sickle cell anemia, ulcerative colitis, and systemic lupus erythematusus. Buried in the middle of this boiler plate of risks assumed was cytomegalovirus. The risks also included venereal diseases with several specific diseases itemized. The addendum also advised that the prospective surrogate mother should not sign the contract unless she had talked to her own independent obstetrician and was certain the risks were small enough so that she should sign. Under this contract the father was to deposit $10,000 in escrow with Keane to be paid to the mother, for her services, on surrender of the child. If she miscarried before the end of the fourth month, she was to be paid no part of the fee. In case of miscarriage, still birth, or death of the child after the completion of the fourth month, the mother was to receive $1000 of that fee.

This second contract required both parties to

undergo a complete physical and genetic evaluation, under the direction and supervision of a licensed physician, to determine whether the physical health and well being of each is satisfactory. Said physical examination shall include testing for venereal diseases, specifically including syphilis and gonorrhea. Said venereal disease testing shall be done prior to each insemination.

In addition to these provisions aimed at the health of the child, the woman agreed to follow medical instructions, to go to a specified number of prenatal exams, and not to smoke, drink alcoholic beverages, or use illegal drugs nor non-prescription or prescription drugs without written consent of her doctor.

Keane's program included no written plan or instructions to the parties or other program participants, no description of responsibility. There was no description of

who was to give information to the prospective surrogate mother or what information was to be provided. The program had no written directive, for example, as to counselling on fertility or the risks inherent in artificial insemination generally or particularly as those risks might occur in a surrogacy context. Moreover, the professionals apparently kept no written records beyond notes as to procedures administered. They kept no narrative as to advice or counseling they gave or as to questions they asked of the prospective surrogate mother. There also was no written plan for testing the semen nor even a directive to test the contracting father for any sexually transmitted diseases. Although the contract required "complete physical and genetic evaluation" which was to include "testing for venereal diseases," no program rule required and no one in the program took responsibility for providing this evaluation or monitoring the process to see that this kind of evaluation was done.

Keane advertised his program through direct advertising, through interviews for newspapers, and by appearing on television programs discussing surrogate parenting. The record does not make clear how Malahoff learned of Keane's program, but Malahoff contacted Keane concerning the surrogacy program in late 1981. Keane responded by sending Malahoff a copy of the standard form contract Keane used between himself and contracting fathers and told him to make an appointment if he was interested, bringing the copy of the contract and $5,000 to the appointment. Malahoff contacted Keane again in March 1982, engaging the services of Keane's surrogacy program for a nonrefundable fee of $5,000 plus costs and expenses. Meanwhile in February 1982 Judy Stiver, who lived in Lansing, learned of Keane and his program in an article in the *Lansing State Journal.* She wrote to Keane at his office in Detroit, asking for an application. He provided the application when he was in Lansing, and the Stivers submitted the application and a picture of Judy in late February.

Late in March Keane's office notified Judy Stiver that she had been selected as a surrogate. His office made appointments for her for April 7 to see Dr. Ringold and Dr. Parker. In addition Keane's office made an appointment for the Stivers with the lawyer, Hayes. Judy Stiver notified Keane's office of the onset of menses on April 1. She was told to come to her appointments as scheduled at the predicted end of her menses on April 7. The record suggests that Judy and Ray Stiver had unprotected sexual intercourse on the morning of April 7 before going to Detroit. In Detroit on April 7 Judy Stiver went to the appointments set up for her by Keane's office with Dr. Parker and Dr. Ringold. She and Ray Stiver met with Mr. Hayes so they could sign the contract. Despite the advice that the prospective mother should see her independent obstetrician, the program was set up to have her sign the contract the day it was presented to her; the Stivers did not see the contract until they went to Keane's office and met Hayes for about one-half hour, and then signed.

Judy Stiver saw Dr. Parker again on April 10, at which time Parker talked to Ray Stiver as well. Judy was sent to Dr. Jorge on April 14 for an examination, including testing for some sexually transmitted diseases, for rubella, and for fertility. On April 15 and 16, following testing to determine whether she was pregnant, Judy Stiver was artificially inseminated with the fresh, untested semen of Alexander Malahoff. Judy Stiver stayed in contact with Keane as Keane monitored the contract compliance. Christopher, son of Judy and Ray Stiver, was born on January 10, 1983, infected with cytomegalovirus resulting in cytomegalic inclusion disease.

## II. Affirmative Duty of Protection

We have noted that this negligence case poses questions of first impression concerning the rights and duties of those involved in surrogacy arrangements. The courts have not yet developed a set of precedents defining these rights and duties.[7] The

7. The cases deal primarily with enforceability of the contracts and placement of children born as

scholarly literature on the subject deals primarily with whether such commercial arrangements for the transfer of babies should be disallowed as contrary to public policy,[8] an issue the parties do not raise or argue in this case. The Stivers argue rather that persons like the defendants who develop, manage, operate or participate in surrogacy programs must exercise a high degree of diligence in investigating and taking steps to prevent the harm that may come to a surrogate mother and child and that Keane's failure to exercise the requisite standard of care led to the injury here.

In developing principles governing surrogate arrangements, we are in new, uncharted waters. The law has not visited this place before. In the absence of statutory law positively governing our decision, we must innovate. For as Cardozo told us seventy years ago: "Insignificant is the power of innovation of any judge, when compared with the bulk and pressure of the rules that hedge him on every side. Innovate, however, to some extent, he must, for with new conditions there must be new rules." CARDOZO, NATURE OF JUDICIAL PROCESS 163 (1947).[9] Michigan cases reinforce the principle that in negligence cases involving changed circum-

stance or changed social policy or new levels of risk, common law courts are responsible for developing the law. *See Berger v. Weber*, 411 Mich. 1, 303 N.W.2d 424, 425 (1981) (in recognizing minor's loss of parental consortium court introduced analysis by saying, "Lack of precedent cannot absolve a common-law court from responsibility for adjudicating each claim that comes before it.... Here we must consider the child's claim in light of conditions pertinent to modern society.") The Michigan Supreme Court has noted that "[t]he law of negligence was created by common law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law *absent* legislative direction." *Moning v. Alfono*, 400 Mich. 425, 254 N.W.2d 759, 764 (1977) (emphasis in original).

 Keane and the other professionals defend chiefly on the ground relied upon by our dissenting colleague—they owed no duty to the surrogate mother and child or the contracting father. Keane, they argue, escapes any liability because he hired doctors to provide advice, and the doctors escape liability because they violated no obstetrical or other standard applied in ordi-

---

a result of the contracts. *See, e.g., In re Baby M,* 109 N.J. 396, 537 A.2d 1227 (1988) (affirming trial court's award of custody to biological father, but reversing trial court's termination of natural mother's parental rights and its order allowing wife of biological father to adopt child). *See also Doe v. Kelly,* 106 Mich.App. 169, 307 N.W.2d 438 (1981) (early case in Michigan suggesting public policy was against compensation in surrogacy agreements by refusing to declare unconstitutional or inapplicable to surrogacy contracts Michigan's statute prohibiting exchange of money in relation to adoption proceedings); *Syrkowski v. Appleyard,* 420 Mich. 367, 362 N.W.2d 211 (1985) (Michigan Supreme Court approved use of Michigan's Paternity Act by biological father to establish paternity for child born pursuant to a surrogacy parenting agreement); *Foster v. Stein,* 183 Mich.App. 424, 454 N.W.2d 244 (1990) (in custody dispute arising out of surrogate parenting contract, Michigan court affirmed trial court's finding that it had jurisdiction of the adoption proceeding as a matter of child custody and its conclusion that it should not exercise its jurisdiction because a custody proceeding concerning the child was pending in another jurisdiction).

**8.** *See, e.g.,* Radin, *Market Inalienability,* 100 Harv.L.Rev. 1849 (1987) (discussing paid surrogacy arrangements and commodification of children); Schuck, *Some Reflections on the Baby M Case,* in *Colloquy: In re Baby M,* 76 Geo.L.J. 1793 (1988) (arguing that surrogacy arrangements have sufficient benefit that states should not prohibit them from recognizing the need for regulation); Posner, *The Ethics and Economics of Enforcing Contracts of Surrogate Motherhood,* 5 J.Contemp.Health L. & Pol'y 21 (1989) (in essay derived from address delivered at The Columbus School of Law, Judge Posner sketches the arguments he understands to have been made against enforcing surrogacy contracts, suggesting that these arguments have no merit, and suggesting the need for empirical study of the effect of surrogacy contracts).

**9.** As Cardozo also points out, this development of the law by innovation is well grounded in history: "But in truth the method is not new. It is the method of the great chancellors, who without sacrificing uniformity and certainty, built up as system of equity.... It is the method by which the common law has renewed its life ..." NATURE OF JUDICIAL PROCESS at 163.

nary, non-surrogacy situations. We believe, unlike our dissenting colleague, that this is not an ordinary or routine situation in which the parties can escape liability in negligence so easily by fitting themselves into the framework of ordinary obstetrical practice. We conclude that Keane, the surrogacy business designer and broker, and the other defendant professionals who profited from the program, owed affirmative duties to the Stivers and to Malahoff, the surrogacy program beneficiaries. This duty, an affirmative duty of protection, marked by a heightened diligence, arises out of a special relationship because the defendants engaged in the surrogacy business and expected to profit thereby. Keane owed a duty to design and administer a program to protect the parties, including a requirement for appropriate testing.[10] All parties concede that Malahoff himself

was not tested for anything and that his semen was untested. Judy Stiver was not tested for CMV. The lack of an appropriate plan for protection raises a jury question whether the program was operated in disregard of foreseeable risks of harm. The design of the program raises clear issues of negligence: there was no meeting or counselling possible in a program designed so that the prospective surrogate mother sees all the professionals for the first time only seven or eight days before she is to be inseminated. On that same day she sees the contract for the first time, is expected to sign it after a very brief consultation with a participating lawyer provided by the program, and is given a copy only after the insemination. The participating doctors' general lack of specialized information on fertility beyond know-

**10.** The specific testing at issue in this case is for CMV. No one disputes that the program did not require testing for CMV, a duty the Stivers claim the program owed them. Keane argues that he should not be held liable for testing for CMV because the contract between Judy Stiver and Alexander Malahoff did not include CMV testing as part of the venereal disease testing required. He also points to the boilerplate addendum to the contract which lists CMV as one of the risks Judy Stiver assumed. Keane and the other professionals are not beneficiaries of the assumption of the risk terms in the contract between Malahoff and Stiver, terms that shifted the most severe risks to Stiver. They cannot use the contract terms to escape the risk of and immunize themselves from the risks created by the operation of a surrogacy business. Because we do not have before us any question of Malahoff's liability under the contract, it is not necessary for us to address the degree to which the assumption of the risk terms of that contract should be declared void as against public policy.

The Stivers are free to argue to a jury that Keane, as a part of his affirmative duty of protection with its obligation of complete diligence, should have been careful enough to develop protective measures such as are now recommended. The American Fertility Society's 1986 "Guidelines for the Use of Semen for Donor Insemination" sets out a rigorous multi-stage plan for screening donors and suggests that if a donor has had CMV, most investigators recommend not using semen from that donor, even for a CMV-positive recipient. The Guidelines point out that "[b]ecause the consequences of CMV to neonatal health are so serious, special attention should be paid to this issue." *See* 46 Fertility and Sterility 85S (1986). *See also* Mascola, *et al., Screening to Reduce Transmis-*

*sion of Sexually Transmitted Diseases in Semen Used for Artificial Insemination,* 314 New England Journal of Medicine 1354 (1986) (noting that "[s]exually transmitted organisms have been transmitted during artificial insemination by donor, and such transmission can cause ... disease in the recipient woman and may harm the fetus or newborn" and asserting that "screening of both donor and the donated semen is necessary to avoid infectious complications"). Screening for CMV is recommended. *Id.* Use of frozen semen is recommended because each sample should be tested, and test results cannot be evaluated on the day of donation. *Id.*

They may also argue to a jury that the term venereal disease should be read to include CMV. Several years before Keane dealt with Malahoff and the Stivers, CMV was written of as "venereally transmitted," *see, e.g.,* Lang (1975) *supra* n. 5, and thus the contract can be interpreted as requiring CMV testing as part of the obligation to test for venereal disease. In addition, they can argue that by 1982 the term venereal disease was medically out of date, the appropriate term being *sexually transmitted disease. See* Record Document 182, attached medical testimony, asserting that the medically appropriate term for what had commonly been called venereal disease was *sexually transmitted disease* but that the terms were used interchangeably. The contract requiring venereal disease testing would then serve as evidence of what should be part of the standard of care for the program. They can argue that Keane's affirmative duty of protection included writing a contract with current medical terms. Certainly, to the extent that the contract seeks to deny the affirmative duty of protection as to Keane and the program professionals, it is against public policy.

ing the technical procedures for insemination is further evidence from which a jury could find a lack of care in program design. The failure to see that Malahoff underwent testing raises a jury issue of negligence.

We have no precedent applicable to the question in this case, but we find guidance for our decision in related statutory law, in public policy considerations, and in long established principles of tort law imposing an affirmative duty to act when parties have a "special relationship."

Although Michigan has now outlawed surrogacy contracts, the arrangement here occurred well before the adoption of the Michigan statute, and we will assume for purposes of this case, as do the parties, that the arrangements are not void as against public policy. Even so, in formulating principles of liability to deal with such arrangements, we find relevant to our inquiry the later Michigan statute outlawing such contracts, the longstanding Michigan policy prohibiting charges and fees in connection with adoption except those fees approved by the court,[11] and the national policy against selling human organs.[12] The public policy considerations derived from these statutes,[13] and the high level of risk of loss to the child and to the surrogate mother and her family and to the putative father and his family influence our decision. Our view is that surrogate arrangements for the transfer of babies present significant dangers for society and therefore require careful regulation and control through the development of the common law of negligence. The state has a strong interest in controlling, and has historically controlled, transactions dealing with transfers of babies—adoption[14] and custody issues.[15] This strong state interest justifies regulation, developed by common law negligence, in new areas of "baby transfer" made possible by technology.

A multitude of problems like the one in this case are foreseeable in connection with surrogacy arrangements. Without careful planning, instructions to the parties and testing, confusion can arise as to the child's parentage. The surrogacy process involves exchange of body fluids between persons who are strangers to each other and unknown to the broker so that without careful planning and testing, neither the parties nor the broker can know the risks of sexually transmitted diseases. The contracting parties may change their minds due to changed circumstances and abandon the child, as Malahoff appears to have done in this case after Christopher was born with birth defects, even before it was discovered that Malahoff was not Christopher's father.[16] This may lead to child abuse. Such arrangements may lead to the monetization of a surrogate mother's at-

---

**11.** *See* Mich.Comp.Laws Ann. § 710.54 (providing that "a person shall not offer, give, or receive any money or other consideration or thing of value" except those fees or charges approved by the court in connection with the process of adoption).

**12.** *See* 42 U.S.C. § 274e(a) & (b) (setting out prohibition against acquiring, receiving or transferring "any human organ for valuable consideration for use in human transplantation if the transfer affects interstate commerce" and providing for a fine of not more than $50,000 or imprisonment of not more than five years or both).

**13.** Statutes not strictly applicable, such as the two Michigan statutes cited above and the national organ sale statute may supply evidence of public policy relevant to judicial decisions. *See Moning v. Alfono,* 400 Mich. 425, 254 N.W.2d 759, 772 (1977) (drawing from statutory law of other jurisdictions for indication of public policy in development of negligence law, Michigan Supreme Court stated that "[s]tatutes and other legislative judgments may themselves be a source of common law. This legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law.' *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 390–91, 90 S.Ct. 1772, 1782, 26 L.Ed.2d 339 (1970)"). *See also* Weinrib, *The Case for a Duty to Rescue,* 90 Yale L.J. 247, 270 & n. 89 (1980) (discussing use of statutes as sources of public policy).

**14.** *See* Mich.Comp.Laws Ann. §§ 710.21–710.70.

**15.** *See* Mich.Comp.Laws Ann. §§ 722.21–722.28.

**16.** *See* Record Document 154, Exhibit E (hospital motion to court to be able to treat baby in face of Malahoff's order that the child not be treated).

tributes like race, intelligence, beauty and social standing, or the child may be of the wrong gender. There is more at stake here than simply the values of the marketplace and freedom to contract which prevail in ordinary commercial activities. Because surrogacy contracts create a high degree of risk of injury or loss, we conclude that the programs under which these contracts are arranged—when not outlawed as against public policy—create affirmative duties of care.

■ The relationship between the surrogacy broker and the participating medical and legal assistants he employs on the one hand, and the surrogate mother and contracting father on the other hand is a "special relationship" within the context of negligence law. *See Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 418 N.W.2d 381, 382, 384 (1988) (setting out the principle that "as a general rule, there is no duty that obligates one person to aid or protect another," but that "[s]ocial policy ... has led courts to recognize an exception to this general rule where a special relationship exists between a plaintiff and a defendant" and that in "special relationship" inquiry, the court looks to whether there is a "public interest in imposing such a duty"). This special relationship gives rise to affirmative duties to act on the part of the surrogacy broker and program participants in order to reduce the risk of harm to the child and to the surrogate mother and the contracting father. This duty to act is similar to that imposed on parties to other specialized relationships— for example, sea captains, owners and occupiers of land, common carriers, and others who have undertaken a special task, sometimes perilous, and who must therefore carry it out with a high degree of diligence and deliberation in order to avoid harm to participants in the undertaking. *See Felgner v. Anderson*, 375 Mich. 23, 133 N.W.2d 136, 140 (1965) (stating that "[t]he measure of duty of a negligence-charged defendant is ... 'reasonable care *appropriate to the circumstances of the case,* a standard of negligence which allows the fact finder to determine that some factual circumstances reasonably require greater or lesser dili-

gence than do other circumstances in order to constitute reasonable or due care,' ") (citation omitted; emphasis in the original).

■ Although generally negligence law does not impose an affirmative duty to act for the protection of another, *see Hart v. Ludwig*, 347 Mich. 559, 79 N.W.2d 895, 897 (1956), Michigan law recognizes a number of special relationships that impose such an affirmative duty. For example, in *Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d at 383, the Court cited the Restatement Torts, 2d, *see* § 343, pp. 215–216, for the proposition that a possessor of land must exercise due care to protect invitees from unreasonable risk of harm caused by dangerous conditions on the land. Related to this duty a landlord may be liable for unreasonable risk of harm for common areas. *Johnston v. Harris*, 387 Mich. 569, 198 N.W.2d 409 (1972); *Samson v. Saginaw Professional Bldg., Inc.*, 393 Mich. 393, 224 N.W.2d 843 (1975). Similarly a merchant or business invitor may be liable to business invitees, although this duty may be more limited than that owed by a landlord to a tenant because of the lesser degree of control on the part of the merchant-proprietor. *See Cunningham Drug*, 418 N.W.2d at 383–85. *See also Askew v. Parry*, 131 Mich.App. 276, 345 N.W.2d 686 (1983) (duty of proprietor to patron); *Kroll v. Katz*, 374 Mich. 364, 132 N.W.2d 27 (1965) (residential invitor to invitee). In addition to the special relation between owners and occupiers of land, Michigan recognizes a duty to act on the part of common carriers. *See Frederick v. Detroit*, 370 Mich. 425, 121 N.W.2d 918 (1963). In *Farwell v. Keaton*, 396 Mich. 281, 240 N.W.2d 217, 222 (1976), the Court recognized that a special relationship may arise between social companions "engaged in a common undertaking." Among other special relationships recognized by Michigan law are the following: innkeeper to guest, *see Keech v. Clements*, 303 Mich. 69, 5 N.W.2d 570 (1942); employer to employees, *see Bradley v. Stevens*, 329 Mich. 556, 46 N.W.2d 382 (1951) and *Blake v. Consolidated Rail Corp.*, 129 Mich.App. 535, 342 N.W.2d 599 (1983); psychiatrist to patient,

*see Hinkelman v. Borgess Medical Center,* 157 Mich.App. 314, 403 N.W.2d 547, *leave denied* 428 Mich. 905 (1987); doctor to patient outside medical malpractice liability, *see Duvall v. Goldin,* 139 Mich.App. 342, 362 N.W.2d 275 (1984), *leave denied* 422 Mich. 976 (1985). *See also Keeton, et al.,* Prosser and Keeton On Torts, 5th ed., at § 56, pp. 375–77 (including jailor to prisoner, school to pupil, and ship to sailor overboard).

■ Courts traditionally have imposed an affirmative duty in special relationship cases because the person upon whom the duty to act is imposed has assumed some special task or role and expects a benefit or profit. That such a principle underlies affirmative duties in negligence is not a new idea. *See generally,* Bohlen, *The Basis of Affirmative Obligations in the Law of Tort,* 44 Am.L.Reg., N.S., 209 (1905) (discussing development of affirmative duties in tort as derived from assumpsit and noting early cases); McNiece and Thornton, *Affirmative Duties in Tort,* 58 Yale L.J., 1272 (1949) (reiterating Professor Bohlen's thesis that assumpsit is the foundation for affirmative duties in tort and setting out characteristic features of cases in which affirmative duties are imposed). Professor Bohlen suggested that the most basic ground for imposing a duty to act within a particular relation arises from assumpsit from which the law of negligence is derived: the person on whom the duty is to be imposed has assumed the duty to aid or protect another. Bohlen, *supra,* at 218. *See also* Plucknett, A Concise History of the Common Law 468–72 (5th ed. 1956) (noting affirmative tort duty is grounded in assumpsit and underlies early negligence development and suggesting that there is reason to believe "negligence" was first used in sense of "neglected to do something," citing cases as early as fourteenth century). Early on, this assumpsit, this theory of an added obligation arising from an undertaking, involved various trades or businesses in which a person held services out to the public and made a profit thereby: for example, "carriers, innkeepers, barbers, surgeons, and physicians." *Id.* at 218–19. This "duty to take precaution to insure the safety of others.... was an incident of the assumption of a business carried on for gain, a business of a sort which if not carefully carried on is dangerous to those on whom it is exercised." *Id.* at 220. Some years later Professors McNiece and Thornton reiterated this feature that Professor Bohlen had set out: when we look for a fundamental characteristic which holds together those cases in which courts have imposed affirmative duties to act, we find as "a binding thread ... a *benefit principle.*" McNiece and Thornton at 1282–83. They noted that "[a]ffirmative duties are imposed only in situations where the one under the duty to act has voluntarily brought himself into a certain relationship with others from which he obtains or expects benefit." *Id.*[17]

■ In addition courts impose a duty to protect in special relationships because one party is in control and the other has entrusted himself to the party in control. *See Myers v. Robb,* 82 Mich.App. 549, 267 N.W.2d 450 (1978). This element of control and entrustment may flow from the defendant's having assumed a special role.

---

**17.** The duty owed in a special relationship is often based on a two party relationship under which one delivers a service and the other pays for the service, for example the proprietor and patron or innkeeper and guest. That feature is not essential however. The duty may be founded on a relationship between two persons but the protective action required may be for the protection of a third person. *See Duvall v. Goldin,* 139 Mich.App. 342, 362 N.W.2d 275 (1984), *lv. den.,* 422 Mich. 976 (1985) (failure to warn epileptic patient not to drive automobile creates liability in doctor for injury to third person in automobile accident between patient and third person, this duty founded on the special relationship between doctor and patient, outside duties expressed in medical malpractice terms). The benefit or profit expected may or may not be provided by the person to whom the affirmative duty to protect is owed. *See id. See also* Bohen, *supra,* at 220–21 (noting law developed so that assumpsit did not have to be alleged for public callings such as a common carrier and duty to exercise care imposed "irrespective of who made the contract or paid the price" while assumpsit did have to be alleged when duties outside public calling were taken on, although again, it did not "matter from whom the consideration moved").

When a person "voluntarily attempts to aid a victim and takes control of the situation, he must use due care to act so as not to unreasonably endanger the person or property of another." *Bell v. Hudson, P.C. v. Buhl Realty Co.*, 185 Mich.App. 714, 462 N.W.2d 851, 853 (1990). In such situations, "one person entrusts himself to the control or protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety." *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 418 N.W.2d 381, 383 (1988). Further, a relation of "confidence" often characterizes such relationships. *Madley v. The Evening News Association*, 167 Mich.App. 338, 421 N.W.2d 682, 684 (1988). In analyzing special relationships and deciding whether one person has a duty to aid or protect another, courts also look to whether the defendant "create[ed] any hazard which did not already exist, ... [or] increas[ed] existing hazards by either taking or not taking certain steps." *Id.* 421 N.W.2d at 685.

Affirmative duties in the law of negligence, because they most often are grounded in a benefit principle and are by nature "assumptional," *see* Bohlen, *supra*, at 235, operate in the boundary between tort and contract. Although affirmative duties in negligence law are imposed "by operation of law," a contract frequently operates in the background and the specific obligations "may and frequently do[ ] arise out of a contractual relationship." *Clark v. Dalman*, 379 Mich. 251, 150 N.W.2d 755, 760 (1967) (court found negligence action would lie in case where contractor failed to warn engineering firm inspector that inside of tank had been coated, despite obligation, in contract between city and contractor, to report stages of progress to engineering firm). However, "the contract creates only the relation out of which arises the common-law duty to exercise ordinary care.... [T]he contract merely creates the state of things which furnishes the occasion of the tort." *Id.* 150 N.W.2d at 760. As a result "the existence of a contract is ordinarily a relevant factor, competent to be alleged and proved in a negligence action to the extent of showing the relationship of the parties and the nature and extent of the common-law duty on which the tort is based." *Id.* Nevertheless, the contract by itself does not create the duty, and these affirmative duty cases are said to retain their fundamental tort identity.

Keane and his program fall within the principles found in these negligence cases imposing a duty to act. As the facts make clear, Keane assumed a task and role as a surrogacy broker, and the other professionals participated in the program Keane designed. The group were in this sense joint venturers engaged in an entirely new kind of project. They are entrepeneurs pioneering in a new field. Keane, as well as the doctors and the lawyer, expected to profit from their roles in the program. Keane held out the services of his program. He should not be allowed to wash his hands of responsibility by turning the project over to others, as the dissent argues. Keane exercised control, drafting the contracts, organizing the transactions between the parties and professionals, and monitoring the contract compliance. The parties entrusted themselves to Keane and his associates. The participants were led to rely on the broker-designer's direction and advice concerning procedure and professionals to trust. The defendants, by offering an attractive avenue for a woman to make $10,000 without specifying, acknowledging, or explaining the multiple dangers involved have magnified the risks of harm. In such circumstances the defendants have an affirmative duty reasonably to protect the surrogate mother, the child, and the contracting father from foreseeable harm caused by the surrogacy undertaking. It is for the jury to decide whether the broker and the professional participants have provided the kind of care commensurate with the exercise of a high degree of diligence in protecting the parties from harm.

### III. District Court Requirement of Expert Testimony

The District Court gave summary judgment for all parties and against the Stivers on all claims, holding that the Stivers had

not established a genuine issue as to a material fact concerning an essential element of the case for which they had the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The District Court framed the cause of action as sounding in medical and legal malpractice against Keane and all the professionals. It held that claims against them failed because the Stivers failed to present expert witnesses as to the appropriate standard of care, a requirement under Michigan law for a medical or legal malpractice case to go to the jury. *Lince v. Monson,* 363 Mich. 135, 108 N.W.2d 845, 847–48 (1961) (stating that "the plaintiff must produce medical testimony to the effect that what the attending physician or surgeon did was contrary to the practice in that or similar communities" excepting only those cases in which the physician's care was so manifestly outside the acceptable range as to be recognizable as such to the ordinary person). Michigan law requires similar expert evidence in a legal malpractice case. *Beattie v. Firnschild,* 152 Mich.App. 785, 394 N.W.2d 107 (1986) (holding that in legal malpractice case, plaintiff must establish malpractice or violations of Professional Code or Rules by expert testimony).

■ Insofar as the cases against the defendants are framed narrowly as malpractice causes of action, the District Court is correct. We do not read the complaint or the papers on summary judgment or on appeal, however, as so narrowly framed. The plaintiffs' theory is based rather on general principles of tort law establishing affirmative duties to act. The malpractice requirement of expert witness testimony does not apply in circumstances involving negligence liability of those who undertake to operate a surrogacy program.

In the instant case the purpose of Michigan's expert witness rule in professional malpractice cases is not served. The rule is based on an assumption that there is an existing custom and practice in the profession which defines the standard of liability applicable to the particular professional conduct in question. An expert witness is needed so that the fact finder will understand the professional norm. The instant case is one of first impression involving an entirely new area of practice for doctors, lawyers and surrogacy brokers. The legal standards and policy and professional norms are just in the process of being established. General principles of tort law outside the standard malpractice area are at stake. Therefore, we conclude that the District Court erred in dismissing the plaintiffs' case because they did not produce expert malpractice witnesses.

## IV. Causation

The defendants—Keane and the other professionals participating in the surrogate program—also argue in the alternative that the case should not go to the jury because there is no evidence that the plaintiffs' injury was caused by the surrogate program. The defendants claim that the infant's CMV could have been transmitted by Ray Stiver's sperm or could have been transmitted to the mother through contact with the Stivers' then two-year-old child.

The Stivers contend that Malahoff's untested sperm is the most likely cause of their injury. They argue that in any event the program caused the injury: no child would have been born had the defendants' conduct not induced Judy Stiver to become a surrogate mother and lulled her into a false sense of security that there were no significant risks of injury involved.

The District Court has not ruled on the factual question of causation in the case. We view the evidence as presenting a jury issue of causation and therefore remand this issue to the District Court for further proceedings.

KENNEDY, Circuit Judge, dissenting.

I agree with the majority that the participants in a surrogacy enterprise are subject to legal duties including the protection of the surrogate from medical risks. I disagree as to the source of that duty, and its application in this lawsuit, however, and believe the majority has implemented a so-

cial policy rather than a legal standard, one that imposes liability with no discernible contours or bounds and in fact borders on strict liability.

First, as to Keane, I agree with the majority that because of the attendant public policy considerations, surrogacy "facilitators" such as Keane have a "special relationship" to participants in surrogacy contracts. Under Michigan law, Keane had a common law duty to protect Mrs. Stiver from foreseeable medical risks posed by the surrogacy procedures. Like all legal duties short of strict liability, however, to say there is a duty is only to begin the legal analysis. Keane's duty to protect against medical risks must be carried out in actual practice, and an alleged breach must be assessed against a factual backdrop. Because Keane was not a doctor, I believe his duty is fulfilled by his providing competent medical procedures and personnel to address the medical risks. Keane's legal obligation to protect against medical risks cannot be higher than that of a treating physician. Therefore, Keane's liability for the medical risks posed by the surrogacy stands on the adequacy of the medical assistance secured—absent a showing that Keane failed to procure adequate medical treatment (*e.g.*, by utilizing unlicensed or incompetent doctors, or failing to secure a specialist if necessary), Keane's duty to Mrs. Stiver was not breached.

I believe a similar analysis should apply to the lawyers. Under Michigan law, a lawyer already has a duty to protect a client against risks arising out of the performance of legal services. To the extent such protections extend to encompass accompanying medical risks (and I am not certain they do), they cannot be any greater than, or incorporate any higher standard of care than, that of the treating physicians.

Under Michigan law, doctors have a legally imposed duty to protect patients from unreasonable and foreseeable risks. This duty exists independent of the surrogacy context, and arises in all situations in which a physician is in a position to take reasonable precautions to protect a patient from medical risks. That duty, like all duties, must be given life by a standard of care. Outside the arena of ultra-hazardous activities, and I do not understand the majority to intend to impose that standard of strict liability, the imposition of a legal duty is simply a necessary condition for a cause of action. Actions of persons under a duty must then be analyzed under a "reasonable person under like circumstances" construct to determine whether, in the exercise of ordinary care, foreseeable risks should have been protected against.

The medical risks posed by surrogacy contracts are no different from those from other artificial insemination procedures, as between husband and wife, and are no greater in magnitude than those of other doctor/patient relationships implicating children, (*e.g.*, obstetrics, neonatal neurosurgery). For all cases,[1] the legal duty is the same, and although the particular standard of care under the duty may vary according to the particular circumstances (*e.g.*, rural general practitioner vs. urban specialist), liability must still be grounded upon a breach of a particular standard of care under a duty. I see no reason why the unique circumstances under which the doctor/patient relationship arises here should alter this.

The majority has, I believe, conflated an elevated duty with a higher standard of care under a duty. Michigan law mandates that negligence actions involving doctor/patient medical risks be grounded on some evidence showing a breach of a standard of care. Discarding this rule and analysis is not supportable under Michigan law or under sound logic and policy. Plaintiffs have not argued, and the District Court did not pass upon, anything other than established Michigan law.

In effect, the majority has created a form of strict liability akin to that imposed upon ultra-hazardous activities, for if the jury is not instructed as to a required breach of a standard of care, then liability

---

**1.** The only exception is where the duty has been modified by statute, as in the case of emergency care by a good Samaritan doctor or health professional where liability is limited to cases of gross negligence or willful, wanton misconduct. MICH.COMP.LAWS ANN. § 691.1501.

will be imposed in all cases in which avoidable harm occurs. Medical tests and procedures impose costs and risks of their own, however, and doctors are left to be whipsawed by open-ended liability for the materialization of harm from risks of performing procedures and failing to do so. Although the social circumstances of this doctor/patient relationship may be novel, unsettling and to many unseemly, I see no basis for abandoning settled principles of Michigan law. Absent evidence that a standard of care was breached, liability is unsupportable.

Finally, I disagree with the implication in the majority opinion that the issue of causation is necessarily one for the jury. The District Court has yet to pass on whether there is a material issue of fact regarding causation. Defendants argue that it would be pure speculation for a jury to conclude that the donor, rather than Mrs. Stiver or her husband, was the source of the CMV. The depositions in this case indicate other possible sources of Mrs. Stiver's infection, including her other child bringing the infection home from nursery school. Failure to test the donor sperm cannot be said to have been shown to have caused the infection unless there is evidence that the sperm was the cause of Mrs. Stiver's infection.

For the foregoing reasons, I respectfully dissent.