# Huddleston v. Infertility Center of America Inc.

C.P. of Northampton County, no. 1995-C-5893.

*Jane Ellen Lessner,* and *Edward J. Hays,* for plaintiffs.
*William T. Jackson,* for defendant.

HOGAN, *J.,* April 30, 1996—Before the court for disposition are the preliminary objections of Infertility Center of America Inc., which include a demurrer to the instant complaint filed by Phyllis A. Huddleston.

In general, surrogate mother claims: that in 1994, center served as broker for a surrogate child-bearing agreement between surrogate mother and James A. Austin; that on December 8, 1994, plaintiff bore a child, Jonathan Alan Huddleston, also known as Jonathan Alan Austin, through artificial insemination as a result of the surrogacy arrangement with the child's unmarried father; and that father inflicted fatal injuries upon the child in Bethlehem, Northampton County, Pennsylvania, within the first month following the child's birth. As a result, surrogate mother claims that center is liable in negligence for money damages to her as statutory beneficiary for wrongful death benefits resulting from the death of the child; and that center should be held liable in negligence for a survival claim of the child's

estate.[1] Basically, the estate's suit claims that center breached its duty to the child by failing to counsel father, and psychologically test father as part of the surrogate process.

Surrogate mother also claims individual damages in her own right from the center for negligence on the same theory, and on theories of fraud, negligent infliction of emotional distress and breach of fiduciary duty.

## FACTS AND PROCEDURAL HISTORY

In her complaint filed July 31, 1995, surrogate mother specifically alleges that: center is in the business of arranging for the birth of children through surrogate agreements; that as part of its involvement in the process, center arranges for the selection of the surrogate mother, the meeting of the biological father and the surrogate mother, and all necessary agreements between the parties; that center makes medical arrangements and administrative arrangements for the surrogacy procedures; that center represents and warrants to the public that it is experienced in handling these arrangements; and that center represents it places children in "loving homes."

Surrogate mother alleges that father, a single individual, responded to advertisements placed by center; that surrogate mother had previously advised center she would be interested in acting as a surrogate for persons incapable of conceiving their own children; and that surrogate was selected to be the surrogate mother for father's child.

---

1. On February 22, 1995, the Northampton County Clerk of Orphans' Court issued to surrogate mother letters of administration of the estate of Jonathan Alan Huddleston in no. 1995-0251.

Center prepared a surrogate parenting agreement for the signature of surrogate mother and father. Father executed the agreement on November 19, 1993. Surrogate mother executed the agreement with father on November 24, 1993. Center is not a signatory to the written agreement. No written agreement between center and surrogate mother is pleaded in the complaint.

Pursuant to the agreement between surrogate mother and father, certain physicians with whom center had a business relationship (in which the doctors are characterized by center as independent contractors with the center) caused the surrogate mother to be impregnated with father's sperm. Surrogate mother carried the child, and on December 8, 1994, gave birth to a son, Jonathan, in Indiana. Surrogate mother transferred care, custody and control of the child to father on December 9, 1994. From December 9, 1994, to January 8, 1995, while residing in Bethlehem, Northampton County, Pennsylvania, father repeatedly assaulted and battered the child. Father inflicted severe head and brain injuries, and the child suffered "shaken baby" syndrome. The child was admitted to Muhlenberg Hospital on January 8, 1995; and was transferred shortly thereafter to Children's Hospital in Philadelphia, where he died as a result of his injuries on January 17, 1995.

Surrogate mother initially filed her claims in the U.S. District Court for the Eastern District of Pennsylvania on April 10, 1995, at docket no. 95-2074. On center's motion, surrogate mother agreed to remove the matter from federal court. A stipulation of voluntary dismissal was executed and filed with the court on June 23, 1995.

On August 7, 1995, in Northampton County Court of Common Pleas, father pleaded guilty and was convicted of murder of the third degree and endangering

the welfare of a child in the death of the child, for which he was sentenced to imprisonment by the court.

On October 2, 1995, center caused a writ to issue joining father as an additional defendant herein. The writ was served on October 4, 1995. Center has not followed the writ with a third party complaint against father. Surrogate mother has not been named or joined as a defendant. Father has not appeared in the case.[2]

In surrogate mother's suit as administratrix of child's estate under the wrongful death statute, and for causes of action which survive child's death, she includes claims against center for compensatory and punitive damages. Surrogate mother, as administratrix, brings the wrongful death claims on her own behalf as a statutorily named family member; and a separate count for the benefit of the child, based on claims of negligence. In her individual claim, surrogate mother alleges center is liable for damages to her individually for breach of fiduciary duty and fraud, in addition to negligence and negligent infliction of emotional distress. By preliminary objections filed October 2, 1995, center requests that this court grant a demurrer to each count of surrogate mother's complaint.

## DISCUSSION

### Standard for Preliminary Objections

Preliminary objections may be filed to assert the legal insufficiency of the claims in a complaint. Pa.R.C.P. 1028(a)(4). In ruling on preliminary objections in the nature of a demurrer, the court must accept as true

---

2. In a separate action filed April 12, 1995, and returned to no. 1995-C-2779 in Northampton County, surrogate mother charged father as the only defendant in a companion quest for damages.

all well-pleaded material facts as set forth in the complaint and all reasonable inferences that may be drawn from those facts. *Bower v. Bower,* 531 Pa. 54, 611 A.2d 181 (1992). Preliminary objections should be granted if it is clear and free from doubt from all of the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish his or her right to relief. *Id.* "The question presented by a demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible, and where doubt exists as to whether a demurrer should be sustained, this doubt must be resolved in favor of overruling it." *Scarpitti v. Weborg,* 530 Pa. 366, 369, 609 A.2d 147, 148-49 (1992).

### The Term "Surrogate Mother" Examined

We are aware of two common surrogacy processes currently utilized. One technique involves the artificial insemination of the surrogate mother with the sperm of a male, usually where the parties contemplate that the sperm-donor male and his spouse will raise the child as the child's "parents." A second technique, often referred to as gestational surrogacy, involves a process by which a couple, desirous of having a child, provide both the ovum and the sperm that undergo fertilization in a medical laboratory (in vitro fertilization). The embryo is then placed in the uterus of a woman, not the ovum donor. This woman serves as the surrogate mother, who carries and gives birth to the child. See Paula M. Barbaruolo, *The Public Policy Considerations of Surrogate Motherhood Contracts: An Analysis of Three Jurisdictions,* 3 Alb. L.J. Sci. & Tech. 39 (1992). The present case involves the former, apparently more common surrogacy technique.

Although surrogacy agreements are considered to create relatively new issues in the law, use of the surrogacy concept has been mentioned historically as early as Biblical times:

"Abram's wife Sarai could not bear Abram any children so she gave her maid servant, Hagar, to Abram for this purpose saying, 'the Lord has kept me from bearing children. Have intercourse, then, with my maid; perhaps I shall have sons through her.'" Genesis 16:3. The Bible further declares that a child, Ishmael, was born of this arrangement.

We note with interest the more recent evolution of the term "surrogate mother." In 1979, Black's Law Dictionary defined surrogate parent as:

"A person other than a parent who stands in loco parentis to the child by virtue of his or her voluntary assumption of parental rights and responsibilities. The person appointed by a juvenile court as a child's advocate in the educational decision-making process in place of the child's natural parents or guardian." Black's Law Dictionary (5th ed. 1979).

Presently, although Black's Law Dictionary has neither altered nor removed the definition of "surrogate parent" above, it has added the following definitions to its publication:

*"Surrogate mother.*

"A woman who is artificially inseminated with the semen of another woman's husband. She conceives a child, carries the child to term, and after the birth assigns her parental rights to the birth father and his wife. Matter of Baby M., 109 N.J. 396, 537 A.2d 1227, 1234. See surrogate parenting agreement. . . .

*"Surrogate parenting agreement.*

"Agreement wherein a woman agrees to be artificially inseminated with the semen of another woman's husband; she is to conceive a child, carry the child to

term and after the birth, assign her parental rights to the birth father and his wife. The intent of the contract is that the child's birth mother will thereafter be forever separated from her child. The wife is to adopt the child, and she and the birth father are to be regarded as the child's parents for all purposes. Such contracts have been held illegal and invalid where a woman agrees to act as a surrogate for payment of money with a binding agreement to assign her parental rights to her child. Matter of Baby M., 109 N.J. 396, 537 A.2d 1227, 1234-35." Black's Law Dictionary (6th ed. 1996).

The term "surrogate mother" today is generally considered to describe one who participates in a surrogacy arrangement as set out above.

By statute, Indiana defines "surrogate" as follows:

" 'Surrogate' means a party to a surrogate agreement who agrees to bear or bears a child that is genetically related to:

"(1) The party who agrees to bear or bears the child and an intended biological parent;

"(2) An intended biological parent and a gamete donor who is not:

"(a) An intended biological parent; and

"(b) The spouse of the party who agreed to bear or bears the child; or

"(3) Two intended biological parents of the child." Ind. Code §31-8-2-1, Act of 1988, P.L. 175-1988, effective March 15, 1988.

Arizona defines a surrogate similarly, as "the legal mother of a child born as the result of a surrogate parentage contract." Ariz. Code §25-218.

Legal scholars have questioned the accuracy of the term "surrogate" when used to describe a woman who is in fact the actual biological mother of a child. At

least one author has expressed the opinion that "[t]he term 'surrogate' mother, coined by advocates of commercial surrogacy, is a misnomer. The woman who bears the child is an actual mother; she is a surrogate 'wife.' " Kathryn D. Katz, *The Public Policy Response to Surrogate Motherhood Agreements: Why They Should Be Illegal and Unenforceable,* N.Y.ST.B.J., May 1988.

While addressing the issues in the *Baby M.* case, the Supreme Court of New Jersey observed that, in the surrogacy contract, "the natural mother [is] inappropriately called the 'surrogate mother'; nevertheless, that court went on to discuss at length the natural mother's rights as a 'surrogate mother.' " See *In the Matter of Baby M.,* 109 N.J. 396, 537 A.2d 1227 (1988).

Thus, it appears that the law of several states, and our society as a whole, have come to recognize a type of mother distinct and separate—known as the "surrogate mother." In the initial period in which our law is developing on this complicated subject, a natural mother may be legally termed a "surrogate mother" as a result of her own voluntary conduct. In view of this precedent, we choose to refer to Phyllis A. Huddleston as Jonathan Austin's surrogate mother.

### Choice of Law

In brief and in argument, center and surrogate mother assume that this case will be decided under Pennsylvania law. Our review of available record materials reveals the following: surrogate mother is a resident of Indiana; center is alleged to be an Indiana corporation doing business in both Indiana and Michigan; situs of the surrogate mother's agreement with father is unclear, although the only fair inference concerning the relationship of surrogate mother and center is that their relationship was initiated in Indiana; and father resided

with child in Bethlehem, Northampton County, Pennsylvania, from the day after child's birth until his death.

Although neither party has argued choice of law as an issue for the court's attention, in view of the extraordinary questions presented we are compelled to determine if an actual issue arises over whether the laws of Pennsylvania or Indiana should be applied to any of the claims or defenses raised.

Before a choice of law question arises, there must actually be a conflict between the potentially applicable bodies of law. *Lucker Manufacturing v. The Home Insurance Co.,* 23 F.3d 808 (3rd Cir. 1994). Under Pennsylvania law, extensive choice of law analysis is not required where there is no conflict of law. *Richardson v. John F. Kennedy Memorial Hospital,* 838 F. Supp. 979 (E.D. Pa. 1993). Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a "false conflict" and the court need not decide the choice of law issue. *In re Complaint of Bankers Trust Co.,* 752 F.2d 874 (3rd Cir. 1984). We have not been so informed by the parties and note that the parties, in brief, appear to take the position that Pennsylvania law applies.

Our research has disclosed no Pennsylvania or Indiana authority directly addressing liability of an infertility center in tort to a surrogate or the child born as the result of a surrogacy arrangement. We have determined: (1) Indiana has enacted a statute[3] prohibiting the enforcement of surrogate agreements similar to the one involved in the present action; (2) the Supreme Court of Indiana has specifically refused to enforce a pre-

---

3. Ind. Code §31-8-2-1 reads as follows:

"31-8-2-1. Public policy declaration

"Section 1. The general assembly declares that it is against public policy to enforce any term of a surrogate agreement that requires a surrogate to do any of the following:

conception agreement that purported to terminate a biological father's support obligation to his child;[4] and (3) Pennsylvania and Indiana have both addressed the issue of the transfer of a child for money. As to the last issue, Pennsylvania has enacted the following statute:

"Section 4305. Dealing in infant children

"A person is guilty of a misdemeanor of the first degree if he deals in humanity, by trading, bartering, buying, selling, or dealing in infant children." 18 Pa.C.S. §4305.[5]

Further, Pennsylvania courts have recognized that payments to or for natural parents by adoptive parents are permissible only when the payment is for services which directly benefit the child. *In re Baby Girl D., a Minor,* 512 Pa. 449, 517 A.2d 925 (1986); *In re Adoption of Baby C.,* 47 D.&C.3d 47 (Erie Co. 1987).

Touching on the same issue, Indiana has enacted the following statute:

"35-46-1-9. Profiting from an adoption

"Section 9. (a) Except as provided in subsection (b), a person who, with respect to an adoption, transfers or receives any property in connection with the waiver

"(1) Provide a gamete to conceive a child.

"(2) Become pregnant.

"(3) Consent to undergo or undergo an abortion.

"(4) Undergo medical or psychological treatment or examination.

"(5) Use a substance or engage in activity only in accordance with the demands of another person.

"(6) Waive parental rights or duties to a child.

"(7) Terminate care, custody, or control of a child.

"(8) Consent to a stepparent adoption under IC 31-3-1." P.L. 175-1988, effective March 15, 1988.

4. *Straub v. Todd,* 645 N.E.2d 597 (1995).

5. Act of 1972, Dec. 6, P.L. 1482, no. 334, §1, eff. June 6, 1973.

of parental rights, the termination of parental rights, the consent to adoption, or the petition for adoption commits profiting from an adoption, a Class D felony.

"(b) This section does not apply to the transfer or receipt of:

"(1) reasonable attorney's fees;

"(2) hospital and medical expenses concerning child-birth and pregnancy incurred by the adopted person's natural mother;

"(3) reasonable charges and fees levied by a child-placing agency licensed under IC 12-17.4 or by a county office of family and children;

"(4) reasonable costs of maternity housing for the adopted person's natural mother during the pregnancy and not more than six weeks after childbirth; or

"(5) other charges and fees approved by the court supervising the adoption." Ind. Code §35-46-1-9.[6]

In connection with the negligence claims of surrogate mother, it appears there is no material divergence of the views of Indiana law when compared with that of Pennsylvania. Both states essentially prohibit the private exchange of monetary consideration to pay for the delivery of a child to the custody of another. Both have statutory schemes for the judicial termination of parental rights and adoption of a child.[7] Both have laws which require each parent of a child to undertake responsibilities for support. Indiana's statutory disavowal of surrogacy contracts as violative of public policy, while not matched by Pennsylvania statute, does not add any feature that materially affects the negligence theory upon which the instant complaint is based.

---

6. Act of 1980, P.L. 208, §2.

7. See 23 Pa.C.S. §2101 et seq., §2511 et seq.; Ind. Code §31-3-1-2; §31-6-5-1 et seq.

Although the written agreement between surrogate mother and father is a point of reference to determine the relationship of center, surrogate mother and father to each other, and to the child, we note the instant counts in negligence are clearly not brought to force center to comply with contractual terms of any agreement. The instant complaint sounds in trespass for center's alleged breach of duty to surrogate mother and child. As we find no actual conflict between Pennsylvania and Indiana precedent and policy in the negligence counts, we need not decide the choice of law issue.

Additionally, no actual conflict is apparent with respect to surrogate mother's fraud claim, although that claim arises from a slightly different perspective than the negligence claims. While in her negligence claims surrogate mother represents that the acts or omissions of center caused her injury, she asserts in her fraud claim that it was her own reliance on representations of center that resulted in injury to her.

We note that the existence of an Indiana statute prohibiting enforcement of certain terms of a surrogacy agreement and the lack of a similar statute in Pennsylvania does not affect analysis of surrogate mother's fraud claim on these facts.

As we find no material difference in the laws of Indiana and Pennsylvania with respect to a claim of fraud such as this, we need not address the choice of law issue here as well.

### Case of First Impression

Parties contend the negligence claims against the fertility center bring matters of first impression before the Pennsylvania courts. It appears to be of first impression in Indiana as well.

The premise for surrogate mother's claim that damages are due from the center is somewhat obscure. We state her position thusly: the law recognizes that to prevent the risk of injury to her and the child by his sperm-donor father, under the circumstances presented, center had a duty to both which arose from the surrogacy arrangement, to render psychological and fitness tests to child's father to evaluate father's emotional and mental stability and suitability for parenthood, and administer necessary counseling or training.

When analyzing an issue of first impression, our appellate courts have proceeded by examining general principles of Pennsylvania law and Pennsylvania case law regarding related topics as well as opinions of other jurisdictions regarding the novel issue. See *Lyman v. Boonin,* 535 Pa. 397, 635 A.2d 1029 (1993); *Mentzer v. Ognibene,* 408 Pa. Super. 578, 597 A.2d 604 (1991), *appeal denied,* 530 Pa. 660, 609 A.2d 168 (1991). Initially we look to Pennsylvania, and perhaps Indiana statutes and appellate precedent to determine if there is any law or public policy that applies to this novel claim.

The Pennsylvania appellate courts and legislature appear not to have met full face the issue of a fertility center's duty to a surrogate mother or child. Some sister states have declined to enforce terms of surrogate parenting agreements.[8]

Some have even criminalized involvement with surrogacy arrangements under some circumstances. New York has statutorily provided for civil and/or criminal penalties for involvement with surrogacy arrangements:

8. A number of states have adopted legislation prohibiting entry into surrogate contracts and/or barring their enforcement. See Ariz. Code §25-218; N.Y. Dom. Rel. §122 (McKinney); ND Code §14-

"Section 123. Prohibitions and penalties

"(1) No person or other entity shall knowingly request, accept, receive, pay or give any fee, compensation or other remuneration, directly or indirectly, in connection with any *surrogate* parenting *contract,* or induce, arrange or otherwise assist in arranging a *surrogate* parenting *contract* for a fee, compensation or other remuneration, except for:

"(a) payments in connection with the adoption of a child permitted by subdivision six of section 374 of the social services law and disclosed pursuant to subdivision eight of section 115 of this chapter; or

"(b) payments for reasonable and actual medical fees and hospital expenses for artificial insemination or in vitro fertilization services incurred by the mother in connection with the birth of the child.

"(2)(a) A birth mother or her husband, a genetic father and his wife, and, if the genetic mother is not the birth mother, the genetic mother and her husband who violate this section shall be subject to a civil penalty not to exceed $500.

"(b) Any other person or entity who or which induces, arranges or otherwise assists in the formation of a *surrogate* parenting *contract* for a fee, compensation or other remuneration or otherwise violates this section shall be subject to a civil penalty not to exceed $10,000 and forfeiture to the state of any such fee, compensation

---

18-05; Utah Code §76-7-204. Some states have enacted specific guidelines according to which surrogate-parenting agreements may be arranged. See N.H. Code §168-B:21; Nev. Code §126.045; Va. Code §20-160. For an analysis of states' positions on the enforceability of surrogacy agreements see Danny R. Veilleux, annotation, *Validity and Construction of Surrogate Parenting Agreement,* 77 A.L.R.4th 70 (1994).

or remuneration in accordance with the provisions of subdivision (a) of section 7201 of the civil practice law and rules, for the first such offense. Any person or entity who or which induces, arranges or otherwise assists in the formation of a *surrogate* parenting *contract* for a fee, compensation or other remuneration or otherwise violates this section, after having been once subject to a civil penalty for violating this section, shall be guilty of a felony." N.Y. Dom. Rel. §123 (McKinney).

Michigan, where center is alleged to do business, although not controlling here, has statutorily criminalized certain involvement with surrogacy contracts. Mich. C.S. §25.248(153)(i) provides as follows:

"(1) A person shall not enter into, induce, arrange, procure, or otherwise assist in the formation of a surrogate parentage contract for compensation.

"(2) A participating party . . . who knowingly enters into a surrogate parentage contract for compensation is guilty of a misdemeanor punishable by a fine of not more than $10,000 or imprisonment for not more than one year, or both.

"(3) A person other than a participating party who induces, arranges, procures, or otherwise assists in the formation of a surrogate parentage contract for compensation is guilty of a felony punishable by a fine of not more than five years, or both."

Although the Pennsylvania Legislature has not yet spoken on the issue of enforceability of surrogacy agreements, we note that House Bill no. 668 was introduced to our House of Representatives on February 13, 1995, and subsequently was sent to the House Committee on Judiciary. Pertinent parts of House Bill 668, which seeks to amend title 23 of the Pennsylvania Consolidated Statutes, read as follows:

"Section 2331. Unenforceability of contract

"(a) General rule—A contract purporting to employ a woman to act as a surrogate mother for the sole purpose of pregnancy and delivery of a baby is unenforceable. Neither relinquishment of the baby nor payment of a fee for surrogacy shall be enforceable in any court of this Commonwealth.

"(b) Effect of unenforceability—Such a contract is null and void ab initio."

We also note that in 1987, two competing bills regarding surrogate agreements were proposed in the Pennsylvania Legislature. While H.R. 570, 170 1st Sess. proposed an amendment to title 18 (crimes and offenses) of the Pennsylvania Consolidated Statutes, prohibiting surrogate mothering, H.R. 776, 170 1st Sess. (1987) sought to amend title 23 (domestic relations) to provide for surrogate parenting and allow such agreements to be enforced if they were judicially approved.

Proposed legislation points to the thinking of individual legislators and cannot be considered the policy of the Commonwealth. Thus, the absence of judicial precedence, and the foregoing antithetical legislative offerings, point out that there is no articulated fixed policy on many surrogacy issues in Pennsylvania at this time.

Several courts have been called upon to enter the surrogate parenting arena.

In *Surrogate Parenting Associates Inc. v. Commonwealth of Kentucky*, 704 S.W.2d 209 (1986) the Supreme Court of Kentucky held that a corporation's involvement in surrogate parenting procedures did not contravene a statutory prohibition against purchasing a child for purposes of adoption.

The United States District Court for the Western District of Michigan has refused to allow a surrogate mother to bring federal claims under the Thirteenth and Fourteenth Amendments and the Civil Rights Act against the director of center in the present action for physical injuries sustained in the insemination process, because such private causes of action did not lie under those theories of recovery. *Jane Doe v. Noel Keane,* 658 F. Supp. 216 (W.D. Mich. 1987).

The Family Court of King's County, New York, has held that a surrogate parenting agreement violated a statutory prohibition against acceptance of payment in exchange for surrender of a child for adoption and was therefore void. *In the Matter of Adoption of Paul,* 550 N.Y.S.2d 815 (1990).

In the widely publicized *Baby M.* case, the Supreme Court of New Jersey held that a surrogate contract conflicted with laws prohibiting payment for adoptions, setting specific standards for termination of parental rights, and making consent to adoption revocable for a period of time, as well as conflicting with state public policy. *In the Matter of Baby M., supra.*

In *Doe v. Attorney General,* 194 Mich.App. 432, 487 N.W.2d 484 (1992), the Michigan Court of Appeals upheld the constitutionality of Michigan's Surrogate Parenting Act, declaring surrogate parenting agreements to be void and unenforceable.

In *Johnson v. Calvert,* 5 Cal.4th 84, 851 P.2d 776, *cert. denied,* 510 U.S. 874, 114 S.Ct. 206, 126 L.Ed.2d 163 (1993), the Supreme Court of California held that a woman who agrees to gestational surrogacy, is implanted with the fertilized egg of another woman, and gives birth to the child has, like the genetic mother, a substantial claim to be the natural mother of the child.

However, we have found no United States case which deals with the precise facts presented to us. Our research

discloses that legislators and courts have lent great attention to surrogacy issues, as discussed throughout this opinion. In none of the voluminous materials to which we have been referred did our research disclose a case that presented the precise issue as we have defined it.

The appellate statement we have found most closely approaching our issue is *Stiver v. Parker,* 975 F.2d 261 (6th Cir. 1992), *rehearing denied,* which held in similar circumstances that center had a duty to a surrogate mother and child to take reasonable measures to prevent transmission of physical disease from a sperm-donor father to the surrogate and child.

The issue of psychological testing of a *surrogate* appears in Indiana law where the legislature negates the effect of all surrogate agreements, including any part thereof which would require such psychological testing.[9] We have found no state which specifically requires psychological testing of the biological father for benefit of surrogate and child.

### Surrogate's Claim for Wrongful Death and Survival Damages

To determine if surrogate mother has a viable claim for statutory damages for wrongful death of this child, the court's focus is forcefully drawn first to the factual and legal relationship that surrogate mother had to the child.

### The Complaint for Wrongful Death

In Count I of her complaint, surrogate mother asserts:

(31) Jonathan's death was the direct and proximate result of the wrongful acts of defendants.

---

9. See fn. 3, *supra.*

(32) The wrongful acts consisted of, inter alia, the following:

"(a) failing to design, create and implement a program which protects the children born thereunder;

"(b) failing to conduct a psychological evaluation including but not limited to psychological testing with respect to father to determine if he possessed the requisite parenting skills or mental capacity to raise Jonathan;

"(c) failing to perform an investigation regarding father and his background to determine if he possessed the requisite parenting skills or mental capacity to raise Jonathan;

"(d) failing to determine that father would provide an unsafe environment for Jonathan;

"(e) failing to provide any counseling to father to enable him to be better prepared for parenthood;

"(f) failing to exercise that degree of skill and care as would be expected of the organization controlling the arrangement between the parties; and

"(g) such other negligence as may be determined through discovery."

## Wrongful Death Act

The Wrongful Death Act provides as follows:

"(a) General rule—An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no action for damages was brought by the injured individual during his lifetime.

"(b) Except as provided in subsection (d), the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the

deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.

"(c) Special damages—In an action brought under subsection (a), the plaintiff shall be entitled to recover, in addition to other damages, damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

"(d) Action by personal representative—If no person is eligible to recover damages under subsection (b), the personal representative of the deceased may bring an action to recover damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death." 42 Pa.C.S. §8301.[10]

A wrongful death cause of action benefits only statutorily designated family members, who may recover money damages for harm that they personally suffered as a result of the decedent's death. Wrongful death claims are totally independent of any cause of action that the decedent may have had for recovery for his own personal injuries. *Calhoun v. Yamaha Motor Corp., U.S.A.,* 40 F.3d 622 (3rd Cir. 1994), *rehearing denied, certiorari granted in part,* 115 S.Ct. 1998, 131 L.Ed.2d 999 (U.S. 1995), and *judgment affirmed* by 116 S.Ct. 619, 133 L.Ed.2d 578 (U.S. 1996). The action for wrong-

_____

10. Act of 1976, July 9, P.L. 586, no. 142, §2, effective June 27, 1978, as amended 1982, December 10, P.L. 1409, no. 326, art. II, §201, imd. effective.

ful death may be brought only by or on behalf of specified relatives of the decedent to recover damages in their own behalf and not as beneficiaries of the estate. *Frey v. Pennsylvania Electric Co.,* 414 Pa. Super. 535, 607 A.2d 796 (1992), *appeal denied,* 532 Pa. 645, 614 A.2d 1142 (1992).

For purposes of determining whether a parent can benefit from an action under the Wrongful Death Act, the courts will weigh whether a requisite "family relation" exists between persons of the defined biological or legal connection. In one test of relationship, the court declared such a requisite may be met between parent and child when the "child receives from a parent services, maintenance or gifts with such reasonable frequency as to lead to an expectation of future enjoyment of these services, maintenance or gifts." *Berry v. Titus,* 346 Pa. Super. 376, 381, 499 A.2d 661, 664 (1985).

Examination of the agreement that surrogate mother and father signed discloses conclusively that surrogate mother intended to create a unique biological relationship to the child. Surrogate mother never intended the child to be a part of her family, in the sense that term is fully understood in our law and in our society. It is beyond dispute that surrogate mother failed to establish the kind of relationship with the child the Act specifically requires of one who seeks to qualify for award of damages under subsection (b) of the Wrongful Death Act. Neither surrogate mother nor any person named in the suit meets either the letter or the spirit of the prerequisites that permit a mother or other named family member to recover wrongful death damages for wrongful death of another family member.

The court will not ignore that there is an explicit intention expressed by the surrogate mother in her pre-conception written agreement with father that she would

not nurture, not care for, and not share in the child's life. The agreement, which surrogate mother does not deny having executed, provides in part:

"(11) *Custody.* PHYLLIS A. HUDDLESTON, surrogate, agrees that in the best interests of the child she will not attempt to form a parent-child relationship with any child she may conceive, carry to term and give birth to pursuant to the provisions of this agreement. PHYLLIS A. HUDDLESTON shall voluntarily surrender custody to JAMES A. AUSTIN, biological father, immediately upon birth of the child. JAMES A. AUSTIN agrees to accept custody and assume full legal responsibility for the child born to PHYLLIS A. HUDDLESTON pursuant to this agreement, recognizing the possibility that the child may have genetic or congenital abnormalities. . . .

"(14) *Termination of parental rights.* PHYLLIS A. HUDDLESTON, surrogate, agrees that it is in the best interests of the child and where permitted by law she will institute and cooperate in any proceeding necessary to terminate her parental rights to the child, including the signing of any and all affidavits or documents to finalize the termination proceedings, acknowledging that it is consistent with the intent of this agreement."

The sole anticipated benefit from birth of the child for which surrogate mother bargained in writing was the $13,000 lump sum payment due under the agreement from father, on birth and delivery of the child at birth to the father.[11] No one disputes that this mutual consideration was exchanged. From examination of surrogate mother's agreement with father which is pleaded in the complaint, the court finds surrogate mother openly

11. Father also agreed to pay for most medical expenses of surrogate mother.

acknowledged in writing facts which conclusively prove at the outset surrogate mother fails to meet the basic qualifying "wrongful death" action requirement of a "family relationship." She may not benefit under subsection (b) of the Wrongful Death Statute for those reasons alone.

It is important to note that subsection (d) of 42 Pa.C.S. §8301 (Wrongful Death Act) allows a personal representative to recover damages for decedent's medical and other expenses. The pleading does not recite that the estate had any specific creditors, but does request damages for "medical," "funeral" and "administration" expenses. In an appropriate case, a personal representative may seek reimbursement of such expenses where no person with a "family relation" to decedent exists. See 42 Pa.C.S. §8301(d). Therefore, it is possible that medical and other expenses may be recovered, if a cause of action against center in negligence exists.

We discuss hereafter at the heading *"NEGLI-GENCE—WRONGFUL DEATH AND SURVIVAL AC-TIONS"* the common negligence question which governs whether a cause of action in negligence is well pleaded in either the wrongful death or survival counts.

### Survival Action

42 Pa.C.S. §8302 provides as follows:

"All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants." Act of 1976, July 9, P.L. 586, no. 142, §2, effective June 27, 1978.

A survival action is brought by the personal representative of a decedent's estate in order to recover loss to the decedent's estate resulting from a tort to

the decedent while alive. *Kiser v. Schulte,* 538 Pa. 219, 648 A.2d 1 (1994). In a survival action, the decedent's heirs may recover for decedent's pain and suffering, medical expenses, lost earnings, and funeral expenses. Surrogate mother has made such a claim against center on behalf of the child's estate, for center's conduct before and after conception.

## Wrongful Life

Considering surrogate mother's contention that center should have taken preventive actions *before* the child's conception, the premise arises that surrogate mother may be claiming center, by failing to take certain pre-conception actions, is tortiously responsible for the child's conception and life, as well as his death.

Pennsylvania's statutory prohibition of "wrongful life" actions may be implicated. The "wrongful life" statute reads, in relevant part, as follows:

"(b) *Wrongful life*—There shall be no cause of action on behalf of any person based on a claim of that person that, but for an act or omission of the defendant, the person would not have been conceived or, once conceived, would or should have been aborted." 42 Pa.C.S. §8305.

The Superior Court has reviewed the legislative history of the Wrongful Life Statute, and has determined that, when enacting the statute, the legislature was primarily concerned with eliminating suits brought by children or their parents in an effort to recover damages for the failure to abort a child; that the legislature's expressed overriding concern was to prevent lawsuits leading to eugenic abortions of deformed or unwanted children; and that the legislators specifically stated that this legislation was not intended to bar cases of "wrongful conception" resulting from negligently performed

sterilization. *Hatter v. Landsberg,* 386 Pa. Super. 438, 563 A.2d 146 (1989), *appeal denied,* 525 Pa. 626, 578 A.2d 414 (1989).

There is no indication that the purpose of the Wrongful Life Statute bars suits such as the instant one. Essentially, by claiming that center should have administered psychological testing to father prior to the child's conception, surrogate mother implies that, depending on what results such testing would have revealed, the child would not have been born except for center's alleged negligent omission. In *Hatter,* the Superior Court refused to find that the Wrongful Life Statute bars a class of suits beyond that particular class of suits that the statute was intended to prohibit. We note that in the present case, unlike the situations of a failed abortion or negligently performed sterilization, both parents intended for this child to be born. The circumstances surrounding surrogate parenting arrangements present a unique situation, not contemplated by the Wrongful Life Statute.

Based on Superior Court's reasoning in *Hatter v. Landsberg, supra,* we hold that the Wrongful Life Statute will not serve as an automatic bar to actions against a fertility center that is allegedly responsible in damages for injuries to a child occurring after the child's conception and birth due to negligent acts or omissions by the center in assisting in the surrogacy process. We discuss hereafter whether negligence exists to support a claim for damages under these pleadings.

*Negligence—Wrongful Death and Survival Actions*

In assessing center's liability in negligence for wrongful death or to the child's estate in the survival action, the first question is whether center had any duty to the child, who was party to no agreement, and not in existence at the time center acted in concert with

father and surrogate mother to cause child's conception and birth, and custodial relinquishment to father.

In brief, surrogate mother asserts that center was negligent in (1) failing to investigate contracting father's suitability *before* conception and (2) "handing" child (after birth) to father without performing any investigations into the type of environment in which the child was destined to live. Surrogate mother contends that as a direct and legal result of center's omission to so act, the child was fatally assaulted by his sperm-donor father.

Under Pennsylvania law, the requisite elements of a negligence action are: (1) a duty of the defendant to conform to a certain standard of care; (2) failure to conform to such standard; (3) a causal connection between the failure to conform and injury; and (4) actual loss or damage. *Petrucelli v. Bohringer and Ratzinger,* 46 F.3d 1298 (3rd Cir. 1995); *Schmoyer v. Mexico Forge Inc.,* 437 Pa. Super. 159, 649 A.2d 705 (1994).

## Duty

"Whether a defendant owes a duty of care to a plaintiff is a question of law." *Kleinknecht v. Gettysburg College,* 898 F.2d 1360 (3rd Cir. 1993); see *Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680 (1983). "Duty, in any given situation, is predicated on the relationship existing between the parties at the relevant time. . . ." *Id.* at 642, 462 A.2d at 684.

The United States Third Circuit Court of Appeals has recognized that nonexistence of a duty as a matter of law may occur only when foreseeability is no longer an issue. That court has stated:

"Only when the general likelihood of some broadly definable class of events, of which the particular event

that caused the plaintiff's injury is a subclass, is unforeseeable can a court hold as a matter of law that the defendant did not have a duty to the plaintiff to guard against that broad general class of risks within the particular harm the plaintiff suffered befell." *Kleinknecht, supra,* at 1369, citing *Alumni Association v. Sullivan,* 369 Pa. Super. 596, 601-602, 535 A.2d 1095, 1098 (1987).

"As a matter of law, no duty arises under the law of negligence unless the likelihood of harm to another is foreseeable." *Carson v. City of Philadelphia,* 133 Pa. Commw. 74, 80, 574 A.2d 1184, 1187 (1990). The Supreme Court of Pennsylvania has held that "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation . . . ." *Dahlstrom v. Shrum,* 368 Pa. 423, 425, 84 A.2d 289, 290-91 (1951). Accordingly, our determination whether center owed a duty to the child, to protect the child by requiring psychological testing and counseling, involves a determination of (1) center's relationship with child, and (2) whether or not the risk of the harm which the child suffered was foreseeable by center in view of the relationship it had with the child. We discuss the foreseeability concept first.

## Foreseeability

Postponing the more complex analysis of whether a special relationship existed here, we now address the question of whether the risk of harm to the child in this case was foreseeable under the law. If a special relationship did exist between center and the child, center would have had a duty only to protect the child from all *foreseeable* risks of harm. One who has a definable relationship with another may owe the other a duty to protect against certain classes of risks that

are foreseeable, and not owe a duty to protect against another class of risks that are not foreseeable. What one in hindsight can verbalize and describe with clarity as a sequential set of events factually and causally connected, after the events have come to rest, does not describe the test which energizes legal accountability guiding one's conduct. On the contrary, we believe the legal test of foreseeability provides that one is required to be liable in damages to another with whom he has a defined relationship which incorporates obligation, when that person has acted to the harm of another, or failed to act to avoid or prevent harm to the other, in a manner which logic demands will make one legally accountable in the human experience. Foreseeability appears to us to be as much a legal finding as it is a factual one.

Stated another way, a defendant can be held liable only with respect to those harms which proceeded from a risk or hazard, the foreseeability of which rendered his conduct negligent. *Metts v. Griglak,* 438 Pa. 392, 264 A.2d 684 (1970). This rule is consistent with the Restatement (Second) of Torts §43, which states:

"If a defendant's conduct threatens harm, which a reasonable person would foresee as harmful to a plaintiff, and the plaintiff is, in fact, injured, we start with negligence toward this plaintiff, and the problem is purely one of the extent of liability for the consequences." Restatement (Second) of Torts §43. We stress that foreseeability refers to the *risk* of harm, not the actual harm suffered by a plaintiff.

Foreseeability has been variously discussed as a factor upon which to found duty, and at other times to determine causation. The distinction is not always clear. Our Supreme Court has held that the concept of foreseeability does not determine causation; rather, it de-

termines the scope of the duty owed by the tort-feasor. *Cantwell v. Allegheny County,* 506 Pa. 35, 483 A.2d 1350 (1984); *Zilka v. Sanctis Construction Inc.,* 409 Pa. 396, 186 A.2d 897 (1962), *cert. denied,* 374 U.S. 850, 83 S.Ct. 1915, 10 L.Ed.2d 1070 (1963). In Pennsylvania, "foreseeability is not a relevant consideration in determining proximate cause." See *McCloy v. Penn Fruit Company,* 245 Pa. Super. 251, 369 A.2d 389 (1976). However, foreseeability is relevant to determining the duty owed by an actor. See *Metts, supra.* Our Supreme Court has reiterated that "the doctrine [of] foreseeability has no place when we are considering *proximate or legal cause." Dahlstrom, supra* at 429, 84 A.2d at 292. (emphasis in original) Accordingly, an assessment of foreseeability properly belongs within the legal determination of duty owed.[12]

To determine foreseeability, there is but one question to address: whether a reasonable person in center's position should have reasonably foreseen a risk that this sperm-donor father posed a potential risk that he would fatally assault the child he went to great lengths to have conceived and sought to raise, and devised appropriate precautions to eliminate the harm.

The Sixth Circuit has held that, under Michigan law, a surrogacy broker, another lawyer and physicians who profited from arranging a surrogacy program owed a duty of protection to the contracting father and to the surrogate mother, whose child, although fathered by her husband and not the prospective father, was born

---

12. While foreseeability is correctly omitted as an element of legal causation, foreseeability is an integral part of the discussion of intervening and superseding causes. In particular, foreseeability is relevant in determining whether an intervening force was a superseding cause of harm. *Flickinger Estate v. Ritsky,* 452 Pa. 69, 305 A.2d 40 (1973); *McCloy, supra.* See *Intervening Cause, infra.*

with severe birth defects as a result of the mother's infection during the early stages of her pregnancy with a disease she allegedly contracted from exposure to the contracting father's semen, which had not been tested for such disease. *Stiver, supra.* The Sixth Circuit held that Keane, the surrogacy business designer in that case (and in the present case as well), owed the surrogate mother, the child and contracting father affirmative duties of protection, marked by heightened diligence, and that such a duty arose because the center engaged in the surrogacy business and expected to profit thereby. The circuit court held that because a foreseeable risk of infection through the insemination process existed, Keane had a duty to design and administer a program to protect the parties from such risk, including a requirement for appropriate physical testing. The question of whether appropriate steps were taken was left for the jury.

We have seen no Pennsylvania, Indiana, or any other decision in the United States that has addressed the issue of whether an infertility center arranging a surrogacy agreement has a duty to educate and psychologically test the proposed sperm-donor father or surrogate mother to evaluate mental and emotional conditions to prevent assault or other abuse of a child by the contracting sperm-donor father or surrogate mother when center knows either party is the intended custodian of the child.

In determining whether or not such a duty of care exists, we are mindful of the following words of the Supreme Court of Pennsylvania:

"In the decision [of] whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss

should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.' " *Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 455, 573 A.2d 1016, 1020 (1990) (quoting *Sinn v. Burd,* 486 Pa. 146, 164, 404 A.2d 672, 681 (1979)).

There are numerous foreseeable risks of harm associated with a surrogacy agreement, including but not limited to: the risk of infection to the surrogate mother as a result of contact with the semen of a virtual stranger, as well as corresponding danger to the child. See *Stiver, supra;* other physical harm to the surrogate mother as a result of the insemination procedure. See *Jane Doe v. Noel Keane, supra;* and the risk that the surrogate mother may default on her declared intention to deliver custody of the child, and keep the child after the child's birth. See *Baby M., supra; Johnson v. Calvert, supra.*

It is not entirely clear why the Indiana surrogacy statute included an expectation that provisions in surrogacy contracts that the law sought to summarily nullify include those requiring psychological testing of mother. Our review of Indiana and other jurisdictions which have legislated on the surrogacy issue reflect no contemplation that a custodial sperm-donor father, whether or not married, be psychologically tested or counseled.

We recognize that in Pennsylvania, a preplacement report including an evaluation of the mental health and parenting skills of prospective adoptive (not biological) parents must be prepared before an intermediary may place a child in the physical care or custody of a prospective adoptive parent. 23 Pa.C.S. §2530.[13] However,

13. Act of 1992, May 21, P.L. 228, no. 34, §5, effective in 60 days.

we have found no law requiring that a biological parent must undergo psychological testing or counseling as a condition of parenthood.

The right to procreate has been directly observed by the United States Supreme Court. See *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (holding that forced sterilization of habitual criminals violates the Equal Protection Clause of the Fourteenth Amendment). In the context of surrogacy arrangements, the Supreme Court of New Jersey has stated that "[t]he right to procreate very simply is the right to have natural children, whether through sexual intercourse or artificial insemination. It is no more than that." *Baby M., supra* at 448, 537 A.2d at 1253.

We are aware of no statutes or case precedent in any jurisdiction declaring that a psychologist or someone acting on a psychologist's advice must approve or disapprove a planned pregnancy and childbirth before that right is exercised.

We find that on these facts our laws have not recognized any reasonably foreseeable risk that a child born of a surrogacy agreement will be intentionally killed by the contracting sperm-donor father who enlisted a surrogate mother and declared he intended to have and raise a child. If indeed center had a special relationship with the child, and owed the child a duty to prevent foreseeable risks of harm to the child, we cannot conceive that the horrible abuse and fatal injuries inflicted upon the child by his father, who went to extraordinary lengths for the child's conception, could have been legally foreseeable by center prior to the child's conception.

As the requisite foreseeability is not present, the element of duty is not established. It follows that this analysis need not reach the question of breach: whether

failing to administer psychological evaluations to father were necessary reasonable steps to address the risk of harm that occurred here.

## Special Relationship

Before concluding our discussion of the element of duty, we point out the significance of surrogate mother's allegations that center engaged in negligent acts or omissions both before and after the child's conception. Neither Pennsylvania nor Indiana has precedent stating whether an infertility center has a special relationship, either pre-conception or post-conception, with a child born as a result of a surrogacy agreement that the center arranged.

## Post-Conception

Whether the center could have had a duty to act in the matter after the child was conceived is an interesting query. At conception, this child had two biological parents. Neither party has offered, and the court has not found, any authority that center had standing to question or challenge biological father's parenting abilities or shortcomings after conception. Absent a prima facie right to custody, a third party lacks standing to seek custody as against a natural parent. *Cardamone v. Elshoff,* 442 Pa. Super. 263, 659 A.2d 575 (1995); *Gradwell v. Strausser,* 416 Pa. Super. 118, 610 A.2d 999 (1992). We have found no law which establishes that center had independent standing to interrupt father's parental rights to custody after birth of the child.[14] On this state of the law, center cannot be held liable to the child for failing to question biological father's suit-

14. Courts have recognized, however, that surrogate, as biological mother, has the right to test custody after birth. See *Baby M., supra.*

ability as the child's custodian *after* the child was conceived. Child had two identified biological parents, and center had no standing to question father's right to custody, or the terms of care. Thus, center's acts or omissions involving the process and occurring post-conception do not subject center to liability on these facts.

## Pre-Conception

The gravamen of surrogate mother's claim appears to be a position that, had center conducted psychological tests, the results would have revealed father to be potentially unsuitable. Taking surrogate mother's argument to its end, presumably, surrogate mother holds that had center investigated, center would then (1) have not provided center's services to arrange for father to procure a child through employment of a surrogate mother using artificial conception (which surrogate mother would thereby hypothetically have avoided); (2) have provided counseling and training to father to increase his caregiving skills before insemination; or (3) have gone ahead with the insemination process and have been compelled to cause the child to be placed at birth in personal care of someone other than the father.

The last alternative listed above is ludicrous and needs no further analysis because father, center and surrogate in this case never contemplated that father would be a sperm donor for third parties.[15] Father's purpose,

---

15. The court confines its discussion to the facts at bar, and avoids a general discussion of the duty of center had father been married, and had the surrogacy been conducted for the benefit of father and father's wife, with or without wife's biological contribution of a human egg.

known to all, was to father his own child, whom all knew he intended to raise. We address the initial premise.

Whether a special relationship can exist between a fertility center and a child prior to child's conception is a particularly complex inquiry. Clearly, courts have recognized certain duties owed to a viable fetus in specific instances.[16] Plaintiff now asks the court to recognize that a person not yet in existence in utero may be owed a duty.[17]

Here, neither party brings to the court's attention evidence or authority that the policies underlying nonenforcement and criminalization of surrogacy agreements in sister states were ever intended to penalize an innocent child. Surrogate alleges that center had a special relationship with the child because it designed, administered, and sought to make a profit from the

---

16. See *e.g., Amadio v. Levin,* 509 Pa. 199, 501 A.2d 1085 (1985) (wrongful death action may be brought on behalf of a fully developed stillborn fetus); 18 Pa.C.S. §3210 (abortions are prohibited after a fetus is viable unless the operation is necessary to preserve maternal life or health).

17. In an unrelated legal area, a trustee may owe a fiduciary duty to persons not yet in existence who are part of a class subject to open. *Edwards Estate,* 360 Pa. 504, 62 A.2d 763 (1948); *Bradley's Estate,* 166 Pa. 300, 31 A. 96 (1895). On a larger scale, with less personal accountability demanded, current environmental laws recognize the duty owed by the Commonwealth to preserve our environmental resources for those to be born in future generations. Article I, Section 27 of the Pennsylvania Constitution provides as follows:

"The people have a right to clean air, pure water, and to the preservation of the natural scenic, historic and esthetic values of the environment. Pennsylvania's natural resources are the common property of all the people, *including generations yet to come.* As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people." (emphasis added)

surrogacy program; selected the doctors, hospitals, and lodging; matched surrogate with father; and drafted documents to be signed by surrogate mother and father. Surrogate mother makes a worthy point, but one we need not decide in view of our late finding that the harm to child caused by father's assault was not foreseeable.

Until the last decade or two, only the procreating man and woman could have been expected to play an instrumental biological role in a child's conception. Modern medicine and the advent of surrogacy arrangements, legal or otherwise, have introduced a new class of actors into the process of conception and birth.[18] Now, infertility centers are actually playing an active role in the process of achieving conception of a human life. The question remains whether a special relationship exists between this new class of procreators and children born of these arrangements. Because we determine that the risk of severe physical fatal injuries to the child inflicted by his father was unforeseeable on these facts,

---

18. Due to the astonishing explosion of social relationships we now experience nationally, and the variations of assisted insemination processes, various courts in the United States have determined the terms "father," "mother," and "parent" of a child may now describe a child's potential relationship with: sperm donor and his spouse; egg donor and her spouse; the woman in whose womb the child matures, and her spouse; and adoptive parents (who in some jurisdictions have been thought to include single men, single women, homosexual female partners, and homosexual male partners, as well as the more traditional married heterosexual man and woman). The potential disputes are multiplied exponentially when one considers it is not difficult to envision a child with 16 individuals claiming to be grandparents with many recognized legal rights in Pennsylvania; for example, visitation and intestate succession. The maze is extended when one considers the potential claims of the child against those individuals.

(see *"Foreseeability," supra*), we need not and decline to determine whether center in the present case, by reason of its extensive involvement in the circumstances leading to the child's conception and birth, had a special relationship with the child which carried with it a duty to protect him from foreseeable risks of injury.[19]

## Causation

Apart from nonexistence of a duty, we question whether the wrongful death and survival actions of the child should be barred on defendant's demurrer for want of legal causation as a matter of law.

Pennsylvania has "replaced the traditional 'proximate cause' analysis with the more modern 'legal cause' analysis now in use in many of our sister states as evidenced by its description in the Restatement (Second) of Torts." *Vattimo v. Lower Bucks Hospital Inc.*, 502 Pa. 241, 465 A.2d 1231 (1983); *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111 (1977); *Whitner v. Lojeski*, 437 Pa. 448, 263 A.2d 889 (1970) (opinion announcing the judgment of the court). The Restatement sections describing the test for causation state:

"Section 430. Necessity of adequate causal relation

"In order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's

---

19. The Sixth Circuit has already recognized that an infertility center has a special relationship with the surrogate mother, the contracting father, and the child born of the arrangement. The Sixth Circuit has further held that because of such special relationships, infertility centers have a duty to protect these individuals against foreseeable risks of harm, such as infection to the mother through the insemination process, resulting in birth defects to the child. See *Stiver, supra.* That case also showed an involvement with Noel Keane, director of center in the present action.

conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm.

"Section 431. What constitutes legal cause

"The actor's negligent conduct is a legal cause of harm to another if

"(a) his conduct is a substantial factor in bringing about the harm, and

"(b) there is no rule of law relieving the actor from liability because of the matter in which his negligence has resulted in the harm. . . .

"Section 435. Foreseeability of harm or manner of its occurrence

"(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him for being liable. . . ."

Although causation is usually an issue for the jury, "[w]hen reasonable minds could not differ as to the result, the issue is not one for the jury but for the court." *Alumni Association v. Sullivan,* 369 Pa. Super. 596, 535 A.2d 1095 (1987), *affirmed,* 524 Pa. 356, 572 A.2d 1209 (1990).

When the harm that ultimately results appears to the court to be a remote and highly extraordinary consequence of the defendant's conduct, legal causation will not be found and liability will not attach. *Armarhanov v. Fassel,* 442 Pa. Super. 111, 658 A.2d 808 (1995).

When the facts of a case are not disputed, and the court assumes that the plaintiff can ultimately prove the underlying factual basis of (the) case, and the remoteness of injury from negligence is clear, the court

should make the decision that legal causation does not exist. *Liney v. Chestnut Motors Inc.,* 421 Pa. 26, 218 A.2d 336 (1966). In *Alumni Association, supra,* the Superior Court stated as follows:

"Even where harm to a particular plaintiff may be reasonably foreseeable from the defendant's conduct, and that conduct is the cause-in-fact of the plaintiff's harm, the law makes a determination that, at some point along the causal chain, liability will be limited. The term 'proximate cause' or 'legal cause' is applied by courts to those considerations which limit liability, even where the fact of causation can be demonstrated. Because of convenience, public policy, or a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point as no longer a 'proximate' or 'legal' consequence naturally flowing from the wrongdoer's misconduct." *Id.* at 602, 535 A.2d at 1098.[20]

In *Landis v. Harristown Development Corporation,* 4 D.& C. 4th 125 (Dauphin Co. 1989), the court considered defendant's demurrer to plaintiff's claim of negligence. Plaintiff's decedent was murdered within a construction site under defendant's control. Plaintiff alleged that the killer gained access to the site through an unlocked gate and killed decedent with a piece of lumber obtained at the site. The court found that, due to the

---

20. As mentioned earlier, foreseeability has no application to a determination of proximate causation. *Dahlstrom, supra; McCloy, supra.* In *Dahlstrom,* the Supreme Court stated:

"We are in accord with the doctrine that foreseeability has no place when we are considering *proximate or legal cause.* Foreseeability, however, is an element, as above indicated, when the question of negligence is being considered. . . . [T]he question of foreseeability *in connection with proximate cause* has no application. *Id.* at 428-29, 84 A.2d at 292.

remoteness of injury from the alleged negligent acts of defendant, legal causation did not exist.

Likewise, in the present case, even if the elements of duty and breach had been established, the injury suffered by the child was so remote from the acts or omissions of the center that legal causation cannot exist. Center is not a guarantor against all possible injuries to the child at the hands of one of his biological parents. In the present case, the unthinkable killing of his son by the sperm-donor father appears too far removed from the acts and/or omissions of center to warrant a finding of legal causation.

## Intervening Cause

We have determined above that center cannot be held negligent under the claims of the child's estate, because the requisite duty and causation are not present. If center could be found negligent, the doctrine of intervening and superseding causes comes into play.

Intervening intentional violence of third parties may be an insulator against tort liability of a tort-feasor for earlier action. In determining whether an intervening force is a superseding cause relieving the original tort-feasor of liability, the test is whether the intervening conduct was so extraordinary as to not have been reasonably foreseeable. *Powell v. Drumheller,* 539 Pa. 484, 653 A.2d 619 (1995). Can liability to the child attach to center here, where the injury is caused by intervening felonious conduct of another with whom center has previously acted jointly in the surrogacy process?

Generally, a defendant cannot be held liable when the plaintiff is harmed by the criminal conduct of another in the absence of a special relationship imposing a pre-existing duty. *Elbasher v. Simco Sales Service of Pennsylvania,* 441 Pa. Super. 397, 657 A.2d 983 (1995).

We have declined to decide whether center had a special relationship with the child. We continue our discussion of intervening cause to determine whether, were a special relationship be deemed to exist, the acts of father would cut off center's liability.

An actor may be held liable notwithstanding an intervening criminal act by a third person if the actor, at the time of the negligent conduct, realized or should have realized that the circumstances affording a third person the opportunity to commit a tort or crime might be created and that the third person might avail himself of that opportunity. *City of Philadelphia v. Stepan Chemical Co.,* 544 F. Supp. 1135 (E.D. Pa. 1982).

We discussed earlier the requirement that foreseeability be closely scrutinized, not applied to causation, and applied only to duty when analyzing issues of duty and legal causation. However, our courts recognize that foreseeability is an element discussed also in determining whether intervening actions insulate an earlier tort-feasor from responsibility.[21]

In determining whether an intervening force is a superseding cause, releasing an original tort-feasor from liability for the earlier acts, the test is whether the intervening conduct was so extraordinary as not to have been reasonably foreseeable. *Powell, supra.*

In addition to the above references to intervening criminal acts, we note the law's reluctance to impose liability on an individual or entity for the death of another individual in the context of suicide. An original tort-feasor generally will not be held liable in a wrongful

21. As we have already mentioned, although foreseeability is not relevant to determining proximate cause, it is relevant to determining whether an intervening force was a superseding cause of harm. *McCloy, supra;* see *Flickinger Estate, supra.*

death action when the decedent dies by his own hand. Considering the properties of suicide as a recognized intervening force which relieves an original tort-feasor from liability, the Superior Court has said:

"Generally, suicide has not been recognized as a legitimate basis for recovery in wrongful death cases. This is so because suicide constitutes as independent intervening act so extraordinary as not to have been reasonably foreseeable by the original tort-feasor." *McPeake v. Cannon, Esquire P.C.*, 381 Pa. Super. 227, 553 A.2d 439 (1989).

In an exception, Pennsylvania recognizes suicide as a legitimate basis for a wrongful death action involving hospitals, mental institutions and mental health professionals where there is a custodial relationship and the center has a recognized duty of care towards the decedent. *Id.;* see *Simmons v. St. Clair Memorial Hospital,* 332 Pa. Super. 444, 481 A.2d 870 (1984).

We believe the law recognizes that the criminal homicide of this innocent child, by his father, a single man who went to extraordinary measures to become his father, under the circumstances of this case, is an extraordinary intervening act of the father which would not be legally foreseeable by those such as center.

*Conclusion—Claims on Behalf of the Child's Estate*

We summarize here the conclusions that lead the court to sustain center's demurrer with respect to the claims surrogate mother brings as administratrix of the child's estate: (1) the Wrongful Life Statute (42 Pa.C.S. §8305) will not automatically prevent a negligence claim by a child or the child's estate against an infertility center, even though allegations imply that the child may not have been conceived except for the center's negligence; (2) the particular risk of harm identified

in this action was not legally foreseeable by center; (3) center had no standing to challenge or put conditions on father's right to custody after the child's conception; (4) were the risk of harm identified here deemed reasonably foreseeable, as a matter of law, the acts and/or omissions imputed to center were too remote from the resulting injury to warrant a finding of legal causation; and (5) even if center were determined to be a tort-feasor, the acts of father, who viciously abused and killed the child, constitute intervening and superseding acts, which were not reasonably foreseeable by center.

For these reasons, center may not be held civilly liable in damages for surrogate mother's claims brought on behalf of the child's estate in this action under these facts. Center's demurrer must be sustained on the counts styled wrongful death and survival.

*Surrogate's Individual Claims Against Center*

## Negligence

Surrogate mother claims that center, by its negligence, has caused her to suffer direct, compensable injuries. The pertinent allegations of negligence and injury follow:

"(37) The averments of paragraphs 1-36 inclusive are incorporated herein by reference.

"(38) Defendants owed a duty to plaintiff to establish and administer a surrogacy program which takes all reasonable action to protect plaintiff.

"(39) It is foreseeable that if proper safeguards are not put into place that children born through a surrogacy agreement may be subject to abuse and/or injury.

"(40) It is also foreseeable that such abuse and/or injuries will result in harm to plaintiff.

172

"(41) Defendants were negligent in this matter as set forth above.

"(42) Defendants are liable to plaintiff as a result of such negligence."

The injury to the child came at the hand of the father after surrogate mother had completed her promise to bear, deliver, and transfer custody of the child to a father with whom she had no relationship beyond the confines of the surrogate agreement and experience. Center, surrogate mother and father all knew that under her agreement, surrogate mother disclaimed any rights, and purported to be released from all obligations to the child at the time the child was transferred to the father's custody at birth. The contract and surrounding circumstances disclose that for a price, and a price alone, surrogate mother offered her reproductive capacity for the procreation of a human being, the legal status of whom was never intended by surrogate mother after birth to include surrogate mother's rights and remedies in a normal mother-child relationship.

Surrogate mother makes no claim center negligently caused her to be physically injured in the surrogacy process. Her sole negligence claim would visit on center a duty to protect her from the events which ensued when father committed a vicious assault on a human being whom she had attempted to disclaim as her child in a writing in which (1) monetary compensation set in writing over her signature attempted to supersede any biological or emotional ties surrogate mother could have with the child, and (2) she attempted to negate her legal obligations as mother of a child.

Surrogate mother's agreement with father, into which she voluntarily entered, reserved no control or opportunity for expression of maternal (or even everyday) interest in the child, although the agreement provided

no terms or security under which father, surrogate mother, or anyone else who had custody of the child would be psychologically evaluated or otherwise provide the child with a safe existence. No such undertaking appeared to be required of center or father by surrogate mother. It is in this milieu that the court has to weigh whether center had a duty to surrogate mother to screen the father for mental and emotional stability, and provide parental training, to protect *surrogate.*

To determine whether or not center owed a duty to surrogate mother to protect her from risks of alleged harm she claims to have had inflicted upon her, one must examine the relationship of surrogate mother and center, and foreseeability of the particular harm alleged.[22] The surrogate parenting agreement prepared by center and signed by surrogate mother and father, contained the clauses set out in full above, in which surrogate mother agreed not to form a parent-child relationship with any child born of the surrogacy arrangement; not to seek custody of the child; and to take necessary legal steps to terminate her parental rights of record.

Additionally, the hold-harmless agreement signed by surrogate mother contained the following language:

"I under no circumstances shall *require* that the identity of JAMES A. AUSTIN be divulged to me or to anyone else, and accordingly, forever waive all rights, if any, that I may have as to the identity, address, or any other information whatsoever concerning JAMES A. AUSTIN."

Under these circumstances surrogate mother cannot be heard to deny that the arrangement she shared with center included an understanding she would relinquish

---

22. See *"Foreseeability," supra.*

all parental rights and avoid forming a mother-child relationship.

Some courts have recognized that certain risks of direct injury to surrogate mother in the fulfillment of the surrogacy agreement were foreseeable by a fertility center, and created a duty on the part of center to guard against such personal injuries. In *Stiver, supra,* the Sixth Circuit held that an infertility center run by Keane owed a duty to design and administer a program to protect the parties, including a requirement for appropriate physical testing. The physical injuries to the surrogate mother involved in *Stiver* and those non-physical injuries alleged to have been suffered by surrogate mother in the present case are different classes of injuries.[23] Accordingly, our holding that the risk that the child would be killed by the contracting father was not a foreseeable risk of harm which imposes a duty on center does not conflict with the Sixth Circuit's holding in *Stiver.* There is no need to decide here whether, under the laws of Pennsylvania or Indiana, the risk of contracting disease from the contracting father's sperm is a foreseeable risk which imposes a duty upon an infertility center to take steps to prevent such harm to surrogate mother.

Surrogate mother and center stand on a different footing than the parties in *Stiver* when considering post-birth injury to the child. Within the range of events that enveloped the relationship of surrogate mother with center in the present case, surrogate mother is known to have agreed to relinquish all rights to the child; agreed to form no relationship with the child; and had

---

23. In *Stiver, supra,* it was undisputed that the surrogate mother contracted cytomegalovirus from exposure to the father's semen and that, as a result, her child was born with an active cytomegalovirus.

no contact with the child after birth until center notified her of the assault. Undeniably, the surrogate parenting agreement contemplates no connection between surrogate mother and the care and protection of the child *after* birth. In light of the terms agreed by surrogate mother and surrogate mother's actual release of the child to father, center could not within its relationship with this surrogate mother be found to foresee reasonably that this surrogate mother would be injured by the mistreatment of the child. Absent a duty, surrogate mother's individual action in negligence against center must be dismissed.

We note additionally, that surrogate mother's individual claim against center fails also because the lack of legal causation and presence of intervening causation of injury by criminal homicide is so extraordinary as to obviate center's action as a cause.[24]

### Negligent Infliction of Emotional Distress on Mother

The elements of negligent infliction of emotional distress under Pennsylvania law are: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. *O'Neal v. Department of the Army,* 853 F. Supp. 327, 337 (M.D. Pa. 1994); *Houston v. Texaco Inc.,* 371 Pa. Super. 399, 403, 538 A.2d 502, 504 (1988).

Center's demurrer to this count must be granted for a number of reasons. First, we have found no actionable negligence to exist on the part of center as discussed above. Thus, the first essential element of an action

---

24. See *"Causation"* and *"Intervening Causation,"* supra.

for negligent infliction of emotional distress is not present.

Second, surrogate mother's claim fails because she has not alleged a physical injury to herself. Physical injury must be averred to sustain a cause of action for negligent infliction of emotional distress. *Armstrong v. Paoli Memorial Hospital,* 430 Pa. Super. 36, 44, 633 A.2d 605, 609 (1993), *appeal denied,* 538 Pa. 663, 649 A.2d 666 (1994). Prior cases have specifically held that a parent cannot recover for negligent infliction of emotional distress upon viewing negligently caused harm to a child, without some physical manifestation of harm or injury to the parent. *Wall by Lalli v. Fisher,* 388 Pa. Super. 305, 565 A.2d 498 (1989), *appeal denied,* 526 Pa. 636, 584 A.2d 319 (1989) (mother who witnesses dog attacking her son could not recover absent showing of physical harm).

In her claim for negligent infliction of emotional distress, surrogate mother claims that she suffered "severe emotional injuries and extreme mental suffering." Without an allegation of physical injury, or physical manifestation of emotional injury, surrogate mother has failed to plead a cause of action for negligent infliction of emotional distress recognized under Pennsylvania law.

Finally, surrogate mother has failed to allege a contemporaneous observance of the tortious injury to the child. In *Sinn v. Bird, supra,* our Supreme Court addressed this issue as developed in a line of Pennsylvania cases emanating from *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970). In *Niederman,* Justice Roberts, writing for the majority, first abolished the "impact" requirement, and allowed recovery to a mother, though not physically touched by a negligent force, when the mother was within the zone of danger which the neg-

ligent action affected. Citing the Restatement (Second) of Torts §436, Justice Roberts established that where a defendant negligently creates an unreasonable risk of bodily harm to another, otherwise than by fright, shock or other similar and immediate emotional disturbance, a parent may recover for the fright alone, even absent occurrence of bodily harm threatened by the potential impact. Justice Roberts allows that the connection between fright and serious resulting bodily injury may now be fairly established in evidence due to scientific advances.

Over Justice Roberts' later dissenting opinion in *Sinn,* a plurality ruling of the court expanded the area of protection, and established that individuals outside the "zone of danger" could also recover damages for emotional distress, if they were foreseeable victims. Significantly, the cause of action alleged in each of the cases that led to the developing appellate discussions is not derivative from injury to a third party, but a mental or emotional injury directly to a bystander, caused contemporaneously while viewing an injury to a third party. *Sinn, supra,* established the "standard of recovery for negligent infliction of emotional distress when the emotional injury is foreseeable."

In *Mazzagatti v. Everingham,* 512 Pa. 266, 516 A.2d 672 (1986), the Supreme Court of Pennsylvania held that a mother who does not experience a contemporaneous observance of tortious injury to a close relative does not state a cause of action for negligent infliction of emotional distress under the parameters enunciated in *Sinn, supra.* Following this rule, in *Brooks v. Decker,* 512 Pa. 365, 516 A.2d 1380 (1986), our Supreme Court held that a father, who alleged that he sustained an actual injury upon seeing the broken body of his son who had been struck by an automobile while riding

178

a bicycle, but who failed to allege that he witnessed the accident or his son's injuries, failed to state a cause of action for negligent infliction of emotional distress.

Absent negligence, and in view of our ruling that surrogate mother has failed to allege physical injury or contemporaneous observance of the tortious injury to the infant, Count IV of plaintiff's complaint must be dismissed.

### Breach of Fiduciary Duty

A fiduciary or confidential relationship arises when one party places confidence in another with resulting superiority and influence on the other. *Temp-Way Corp. v. Continental Bank,* 139 B.R. 299 (E.D. Pa. 1992), *affirmed,* 981 F.2d 1248 (3rd Cir. 1992).

In order to establish the existence of a fiduciary or confidential relationship, a plaintiff must show that there was "overmastering influence" exhibited by one entity or individual and "weakness, dependence or trust" on the part of the plaintiff. *Id.*

Black's Law Dictionary, p. 564 (5th ed. 1979) includes the following in its definition of "fiduciary relation":

"An expression including both technical fiduciary relations and those informal relations which exist whenever one man trusts and relies upon another. It exists where there is special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to interests of one reposing the confidence. A relation subsisting between two persons in regard to a business, contract, or piece of property, or in regard to the general business or estate of one of them, of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith."

In Count V of her complaint, surrogate mother alleges conclusions that center owed her a fiduciary duty; that center breached this duty; and that surrogate mother is therefore entitled to damages. Center asserts that surrogate mother has failed to allege facts sufficient to support a finding that a fiduciary relationship existed between surrogate mother and center. We agree.

In *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994), our Supreme Court recognized that a duty exists on the part of an adoption agency to disclose a child's medical history to adopting parents because a "fiduciary or similar relationship of trust and confidence" exists between the adoptive parents and the agency. The statute, however, contemplates that the natural mother will have no knowledge of the adopting parents' identity or suitability when it is intended a child will be adopted by unrelated strangers. Were surrogate to have processed the future of her child in a post-birth legal adoption, and center have been bound as an adoption agency in Pennsylvania, there is no indication surrogate mother would have had any rights to disclosure of the identity of adopting parents or control over the process.

The present facts differ substantially. Although surrogate parenting agreements have been compared to pre-conception adoption agreements, *Barbaruolo, supra* at 67, surrogate mother's relationship with center was different than one would have with an adoption agency. Surrogate mother here agreed directly with father to conceive her child so that the biological father would keep the child. No statute creates a right for mother in Pennsylvania or in Indiana in surrogacy arrangements. Only the written contract between father and surrogate mother could be read to define surrogate mother's intended rights, center's inducement notwithstanding.

There is no inference that surrogate mother paid any money to center or that an agency relationship existed between them. Additionally, surrogate mother signed a hold-harmless agreement, purporting to relieve center from liability for problems arising throughout the surrogacy arrangement. Although this waiver within a surrogacy agreement may not be enforceable to shield center from liability for any physical complications suffered by surrogate mother, it clearly indicates that surrogate mother was on notice that center did not purport to undertake a duty to her beyond assuring her physical safety and holding her earnings until she delivered the consideration in full. Surrogate mother, by her undeniable disclosures in written agreement with father, conclusively puts her where she cannot be heard to allege she relied on center's representations.

## Fraud

In Pennsylvania, the elements of fraud are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Gibbs v. Ernst, supra.*

In her complaint, surrogate mother alleges that center "represented and warranted" to surrogate mother that: (1) center's program was the premier surrogacy program in the United States; (2) center's program was designed and implemented to ensure the safety and well-being of the participants; (3) surrogate mother's surrogacy arrangement would be handled as an adoption. Surrogate mother further alleges that the above representations were false; that the representations were material to

her participation as a surrogate mother; that she justifiably relied on these representations when agreeing to become a surrogate mother; and that she suffered injury as a result of the alleged misrepresentations. In brief, surrogate mother asserts that her reliance on center's representations "led to participation in the program and ultimately to Jonathan's death."

Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth or suggestion of what is false, whether by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. *Pittsburgh Live Inc. v. Servov,* 419 Pa. Super. 423, 615 A.2d 438 (1992). To state a cause of action for fraud, a complaint must provide sufficient facts to support intent to induce by misrepresentation. *Bash v. Bell Telephone Company of Pennsylvania,* 411 Pa. Super. 347, 601 A.2d 825 (1992). In her complaint surrogate mother does not allege that center knew or reasonably should have known as a fact biological father presented a danger. Further, any general representations by center as to how it would conduct the surrogacy arrangement (as an adoption) are alone insufficient to show the requisite intent to defraud. "An unperformed promise does not give rise to a presumption that the promisor intended not to perform when the promise was made." *Id.* at 361, 601 A.2d at 832, quoting *Fidurski v. Hammill,* 328 Pa. 1, 195 A. 3 (1937). Center's self-serving characterization of its services, identified in the complaint, are no more than puffing, which our courts have found in a business circumstance do not amount to misrepresentations. See *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975). Although dealing with the act of procreation as a subject matter here, the plaintiff bases her claim on the same kind of business principles set

forth in *Berkebile*. The representations alleged create insufficient facts to support intent to deceive. The count for fraud must fail.

While we would ordinarily grant plaintiff leave to amend the complaint to remedy the absence of a proper pleading of intent, we decline to do so. The fraud count fails also for lack of the requisite causal connection between representations and surrogate mother's alleged injuries. (See discussion as *"Causation"* and *"Intervening Cause,"* *supra.*)

Pennsylvania allows a cause of action for fraud to lie under certain circumstances in an adoption context. See *Gibbs, supra.* By this opinion, we do not hold that a cause of action for fraud will never lie in the context of a surrogate parenting agreement. Rather, we find that in this case, center's statements do not amount to legally requisite misrepresentations of existing fact to establish intent to defraud; and further, the requisite causal link between the alleged misrepresentations and surrogate mother's injuries is absent.

In closing, we need not examine whether any of surrogate mother's individual claims should be dismissed based on (1) Indiana's statutory law prohibiting the enforcement of certain surrogate parenting agreements, or (2) Pennsylvania's statutory prohibition of baby-selling. Further we need not determine for purposes of this demurrer whether or not surrogate parenting agreements are enforceable in Pennsylvania.

## ORDER

And now, April 30, 1996, it is hereby ordered, adjudged and decreed that defendant's preliminary objections to plaintiffs' complaint are granted. Plaintiffs' complaint against Infertility Center of America Inc. is dismissed with prejudice.